DEFENDERS OF WILDLIFE, the Sierra Club, and Friends of Animals and their Environment, Plaintiffs,

v.

ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY; and Secretary, Department of the Interior, Defendants,

and

American Farm Bureau Federation, a non-profit corporation, Intervenor–Defendant.

Civ. No. 4–86–687.

United States District Court,
D. Minnesota,
Fourth Division.

April 11, 1988.

Brian B. O'Neill, Faegre & Benson, Minneapolis, Minn., for plaintiffs.

Charles R. Shockey, U.S. Dept. of Justice, Washington, D.C., for defendants Adm'r of E.P.A., and Secretary, Dept. of the Interior.

Richard L. Krause, American Farm Bureau Federation, Park Ridge, Ill., for intervenor-defendant, American Farm Bureau Federation.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Plaintiffs Defenders of Wildlife, the Sierra Club, and Friends of Animals and Their Environment, bring this action challenging the registration of strychnine pesticide and rodenticide (strychnine) for certain aboveground uses. Defendants are the Administrator of the Environmental Protection Agency (EPA), who has responsibility for registering products containing strychnine, and the Secretary of the Interior, who is required to consult with the EPA and recommend safeguards when strychnine use might jeopardize any endangered or threatened species. Intervenor-defendant American Farm Bureau Federation represents farmers and ranchers who use strychnine to control rodents.[1]

---

1. The only strychnine uses challenged here are against prairie dogs, ground squirrels, and meadow mice.

This action is brought under several federal statutes: the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1543 (1982); the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703 *et seq.* (1974); the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. § 668 *et seq.* (1986); the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (1975); and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* (1966). The complaint alleges that defendants have, by their continuing approval of strychnine for certain above-ground uses, illegally "taken"[2] threatened and endangered species in violation of several Acts. It further alleges that defendants failed to assist the recovery of species, failed to prepare an environmental impact statement regarding the effects of continued registration of strychnine, and have acted arbitrarily and capriciously throughout the strychnine registration process, in violation of the APA. Jurisdiction is alleged under 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g)(1).

Plaintiffs want injunctive and declaratory relief and attorney's fees. Plaintiffs seek to rescind a March, 1987 "Notice of Intent" by the EPA which permits continued use of strychnine; an injunction requiring the EPA to adopt instead a more restrictive 1983 "Notice of Intent to Cancel" strychnine; and a court order requiring defendants to engage in further study on the effect of continued above-ground strychnine use on threatened and endangered species.

■ Before the court are cross motions for dismissal and for summary judgment

by plaintiffs, defendants, and intervenor-defendant.[3] Plaintiffs seek summary judgment on all claims except count 6—the NEPA challenge, for which they seek dismissal without prejudice. Defendants move for dismissal for failure to state a claim and for lack of standing, and they seek summary judgment on all counts.[4] All parties agree that there are no disputed material facts and that the entire matter should be resolved on these motions. They disagree somewhat on the proper record. Defendants urge that the APA claims should be based solely on the administrative record which was before the EPA at the time of the pre–1987 administrative actions. Plaintiffs argue that more than the administrative record is involved since their challenge is broader than an appeal of administrative action.

I.

Strychnine, or strychnine sulfate (strychnine) is the active ingredient in numerous pesticides and rodenticides. Until recently many of these were registered by the EPA for numerous above-ground uses to control rodents, lagomorphs (rabbits, hares, and pikas), and birds. EPA Strychnine Position Paper 4, at 1 (September 30, 1983), EPA Ex. No. 265[5] (hereafter P.D. 4). Strychnine is most commonly used as a grain bait, and is primarily used against ground squirrels and prairie dogs. P.D. 4, at 1. Up to one-half million pounds annually of strychnine bait is used, primarily in western states for rodent control in rangeland, pasture and cropland. P.D. 4, at 1.

---

2. The term "take" or one of its derivatives is used in several statutes to connote the varied ways in which a member of a protected species can be injured, captured, killed or otherwise harmed. In this instance it generally means killed by strychnine poison. Plaintiffs allege that illegal "takings" occur to numerous species, including golden eagle, bald eagle, other migratory birds, and other endangered birds and mammals. Lists of the affected species are noted below.

3. Defendants' and intervenor-defendant's positions are similar. Except where otherwise noted, references to "defendants" include both defendants and intervenor-defendant.

4. Plaintiffs now seek to dismiss count 6, the NEPA claim, without prejudice. Defendants argue for dismissal with prejudice given the lateness of the request. Defendants have extensively briefed their motion for summary judgment on count 6, and plaintiffs have not responded. On the basis of this record and Fed.R.Civ.P. 41(a)(2), count 6 should be dismissed with prejudice.

5. Citations to EPA Exhibits refer to the record of the EPA administrative proceedings. All references to the administrative record will generally be referred to by that number. *E.g.*, EPA Ex. No. 1.

EPA regulations require that baits be placed in a manner in which the targeted species alone is likely to ingest the poison. Strychnine is non-selective, however; it kills anything which ingests a lethal dose. Mortality can occur to both "target" and "non-target" species—non-target being any species which the strychnine is not intended to kill, but which nonetheless ingests it. Primary poisoning occurs when a lethal dose of strychnine is directly ingested by consuming the grain bait. Mortality can also occur through "secondary poisoning" when a carnivore ingests a lethal dose by consuming an animal or bird which has ingested strychnine or a carcass with unmetabolized strychnine. *See* EPA Strychnine Position Paper P.D. 2/3, at 25 (September 1980); EPA Ex. No. 78, (P.D. 2/3).

Strychnine is registered by the EPA under the procedures established by the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.* (1979). Both registration and cancellation of a controlled pesticide involves a process formerly known as a Rebuttable Presumption Against Registration (RPAR) and now called Special Review.[6] The burden is on proponents of a challenged use of a controlled pesticide to prove that it does not have any unreasonably adverse effect on the environment. 7 U.S.C. § 136a(c). The EPA may cancel or modify a registration when evidence arises that the pesticide may be causing unreasonable adverse effects. The RPAR is concluded by a "Notice of Determination" where the agency explains whether the presumption of risk is rebutted, and explains any changes in the registration.

6. Most of the defendants' actions challenged here occurred before the name change and will be referred to as the RPAR process. The RPAR (now "Special Review") process is set forth at 40 C.F.R. Part 154 (1987).

7. The potentially jeopardized species expressly noted in the biological opinion are the following:
Utah Prairie Dog
Morro Bay Kangaroo Rat
Salt Marsh Harvest Mouse
Red Wolf
Masked Bobwhite

The challenge against above-ground strychnine use at issue here formally began in 1976 when the EPA began the review of potentially adverse effects of strychnine. The review resulted in EPA Position Document 1, (October 27, 1976); EPA Ex. No. 23, (P.D. 1). Later that year the EPA published a Rebuttable Presumption Against Registration, 41 Fed.Reg. 52810 (December 1, 1976), EPA Ex. No. 28, which required registrants to come forward with evidence rebutting the presumption that continued registration exceeded a permissible level of risk. The registrants were required to address whether all continued outdoor above-ground use of strychnine would cause acute toxicity to non-target species and fatality to endangered species. The EPA received numerous response from federal and state agencies, agricultural groups, and individuals.

As part of the RPAR process, the United States Fish and Wildlife Service (FWS), a division administered by defendant Secretary of the Department of the Interior, began a "jeopardy investigation" pursuant to ESA Section 7, 16 U.S.C. § 1536(c) (a "Section 7" investigation). The FWS is charged with determining at the earliest possible time if agency action may affect endangered or threatened species. The FWS reports its findings by issuing a biological opinion. In 1979, the FWS issued a biological opinion to the EPA, summarizing the findings of the Section 7 investigation. EPA Ex. No. 65. The opinion noted 18 endangered species which were "likely to be jeopardized if the above-ground usage of strychnine as presently registered should occur in the areas where these species are found." EPA Ex. No. 65, at 16–29.[7] No likely jeopardy was found to bald

Dusky Seaside Sparrow
Cape Sable Sparrow
Mississippi Sandhill Crane
Puerto Rican Plain Pigeon
Attwaters Greater Prairie Chicken
Yellow–Shouldered Blackbird
Laysan Finch
Nihoa Finch
California Condor
Black–Footed Ferret
San Joaquin Kit Fox
Gray Wolf
Grizzly Bear

eagles and to peregrine falcons, in part because there was no evidence of mortality to these species attributable to ingestion of strychnine. The biological opinion recommended that above-ground use of strychnine should be prohibited in geographical areas where it might jeopardize the continued existence of the noted species or adversely modify their critical habitat. EPA Ex. No. 65, at 33.

Continuing with the RPAR process, the EPA, in 1980, produced P.D. 2/3. It was based on the EPA's own expertise, on the FWS biological opinion, and on information received during the public comments period. P.D. 2/3 was a preliminary examination of evidence supporting and rebutting the original presumptions which permitted strychnine to be registered. *See* 45 Fed. Reg. 73602 (November, 1980) EPA Ex. No. 86.[8] It contained over 100 pages of data and analysis, and suggested cancellation or modifications in the registration of strychnine for dozens of species commonly controlled by above-ground placement of laced baits. *See* P.D. 2/3, at 100–02. The EPA found likely jeopardy to 16 of the endangered species cited in the biological opinion if strychnine were used in their environment. It also noted special concern for the peregrine falcon and Aleutian Canada goose.[9] P.D. 2/3, at 31. In 1982 Congress amended the ESA to require the FWS to include in the biological opinion a statement permitting an "incidental taking" if an agency action is likely to harm members of an endangered species without jeopardizing the entire species. This amendment did not affect the 1979 biological opinion.

The EPA's next step in the RPAR process was P.D. 4, issued on September 30, 1983. P.D. 4 adopted in great part the findings and analysis of P.D. 2/3. It reasoned that the likely jeopardy to endangered species outweighed economic benefits to most continued strychnine uses. The document noted that effective alternatives to strychnine were available which posed less threat to non-target species and which were only marginally more expensive. P.D. 4, at 19–26. The EPA noted with particular detail strychnine's impact on six endangered species.[10] It also noted special concern for the Aleutian Canada goose and peregrine falcon, assessing greater risk to these species from above-ground strychnine than did the FWS. P.D. 4, at 12.

In P.D. 4 the EPA restated its intent to cancel registration of strychnine for above-ground use against most target species, including prairie dogs and meadow mice; and it announced modifications in the terms and conditions of registration for use against other species, including ground squirrels. P.D. 4 noted that continued registration for ground squirrel control was contingent upon the agency receiving more data on the "lowest efficacious bait concentration for ground squirrels." However, the EPA nonetheless proposed allowing continued but restricted use while that data was compiled. P.D. 4, at 42. After P.D. 4 was published, several parties alleged that the sole impetus for the proposed cancellations or modifications was concern for the endangered black-footed ferret. The text of P.D. 4 does not limit its concern to solely that species, however.

After P.D. 4 was compiled, a Notice of Intent to Cancel was then published in the Federal Register, 48 Fed.Reg. 48523 (Octo-

---

**8.** The EPA states the purpose of the document in the introductory section of P.D. 2/3. EPA examined both the risks associated with use of the pesticide (dangerous toxicity or other unreasonable adverse effects) and the benefits of continued use. The principal focus is on economic impacts, however:

> The final Agency decision is based upon achieving the goal of a pesticide performing its intended function without causing unreasonable adverse effects on the environment. P.D. 2/3, at 1.

**9.** The FWS biological opinion found no likely jeopardy for the peregrine falcon or Aleutian Canada goose. That exclusion was based in part on the lack of evidence of falcon mortality attributable to strychnine. EPA Exhibit No. 65 at 7. The EPA nonetheless exercised it prerogative of restricting strychnine use out of concern for likely detriment to those species. P.D. 2/3, at 31.

**10.** Attwater's greater prairie chicken, red wolf, Aleutian Canada goose, San Joaquin kit fox, black-footed ferret, and California condor. P.D. 4, at 7–12.

ber 19, 1983), EPA Ex. No. 266 (hereafter 1983 Notice of Intent to Cancel), which formally announced the proposed changes. Under FIFRA, the published notice would constitute the final agency action unless a hearing was requested within 30 days by someone adversely affected. 7 U.S.C. § 136d(b). If a request is made, the *status quo* for registrations is maintained while a hearing is pending. In this case, EPA received requests for a hearing from the states of Wyoming and South Dakota and other interested parties.[11]

A hearing was scheduled before a hearing officer and a number of parties eventually joined the action.[12] The EPA submitted a brief to the hearing officer stating its position in support of the proposed cancellations. *See* EPA Ex. No. 297. The brief did not point to black-footed ferrets as the focus of concern for the cancellations, but rather expressed a more general concern for numerous species.

Before the hearing date settlement negotiations began, and the hearing was suspended. The discussions apparently lasted nearly two years, from 1984 through 1986. During that time the FWS issued a second biological opinion assessing jeopardy to the black-footed ferret. EPA Ex. No. 280 (November 1984 biological opinion). The FWS concluded that pre-control surveys of prairie dog colonies would effectively preclude jeopardy to any remaining wild ferrets. The November 1984 biological opinion superseded the March 1979 opinion as to ferrets.

In the summer of 1986 the dispute was settled with all but two parties.[13] *See* EPA

Ex. No. 352. No administrative hearing was therefore ever held. Plaintiffs Defenders of Wildlife and Sierra Club were parties to the hearing, and did not enter the written settlement agreement. The agreement was formalized by publishing a Notice of Intent to Cancel. 52 Fed.Reg. 6762 (March 4, 1987), EPA Ex. No. 289 (hereafter March 1987 Notice). The Notice became final after thirty days. The March 1987 Notice permitted the continued registrations for above-ground use of strychine for control of ground squirrels, prairie dogs, and meadow mice. It required label restrictions on all strychnine baits, and pre-control surveys of prairie dog colonies by the FWS and state authorities to assure that there is no evidence of black-footed ferrets living in the area. *See* EPA Ex. No. 289.

Plaintiffs now challenge defendants' actions leading up to the settlement and the March 1987 Notice. They claim that the EPA did an "about-face" by reversing the well-founded and deliberately conceived 1983 Notice of Intent to Cancel, without an adequate scientific basis. They argue that the last formal study was P.D. 4 which recommended a ban on most uses. Thus, they argue, the settlement was reached to accommodate western state agricultual interests, but had no scientific justification. Defendants assert that the settlement was an appropriate resolution of the 1983 Notice of Intent to Cancel. They claim that the motivation behind each FWS biological opinion and the EPA Position Documents which recommended against continued registration was concern for the black-footed

---

**11.** No request for hearing was filed as to the EPA's Notice to Cancel registration of strychnine for control of deer mice, chipmunks, mountain beavers, oppossums, jackrabbits, kangaroo rats and cotton rats. Strychnine registrations for these uses were therefore cancelled. FIFRA, 7 U.S.C. § 136d(b). The only pending challenge before the hearing officer was the proposed ban on registrations for use against prairie dogs and meadow mice, and the restrictions on use against ground squirrels. *See* EPA Ex. No. 297, at 7, n. 5. Those three uses are therefore the only subjects of this action.

**12.** The administrative appeal was docketed as *In re State of Wyoming, et al.,* FIFRA Docket No.

518. It involved the EPA, the States of Wyoming and South Dakota, the American Farm Bureau Federation, the Department of the Interior, the United States Department of Agriculture, Defenders of Wildlife, and the Sierra Club. *See* Notice, 52 Fed.Reg. 6762 (March 4, 1987) at 6762, EPA Ex. No. 289.

**13.** The EPA explained at the hearing before this court that the Administrator retains authority to settle disputes notwithstanding the objection of some parties. The administrator determined that the objecting parties—Defenders of Wildlife and Sierra Club—would not be adversely affected by the settlement.

ferret. That concern was allayed by the 1984 FWS jeopardy study which suggested that pre-control surveys were an adequate precaution.

Plaintiffs commenced this action in August 26, 1986. They have accumulated numerous documents from discovery and Freedom of Information Act (FOIA) requests, indicating mortality to protected species from strychnine poisoning.[14] Plaintiffs submitted the non-target kill book to the EPA in January 1987 to counter EPA claims that there was no evidence of eagle and peregrine falcon deaths caused by strychnine. Plaintiffs also submitted an affidavit by Keith Cline (attachment A to O'Neill Affidavit) which alleges that less than 3.6 percent of bald eagle deaths are discovered and reported. Plaintiffs use this to allege that the number of actual strychnine-caused deaths is a large multiple of those documented.

In September, 1987, approximately one year after this action was commenced, the EPA again reinitiated Section 7 consultations with the FWS. *See* Defendants' Exhibit No. 359, "Supplement to Administrative Record."[15] The consultation was apparently initiated in response to plaintiffs' non-target kill book data. In the request for consultation the EPA also seeks an "incidental take" statement from FWS to authorize in advance any incidental harm to threatened or endangered species caused by agency action.

## II.

■ Defendants argue that this action must be dismissed because plaintiffs have failed to exhaust the administrative remedies provided under FIFRA. They argue that cancellation of the registration of a pesticide can only be accomplished under the procedures set forth in FIFRA, 7 U.S.C. § 136d(b). Defendants claim that plain-

tiffs in effect seek to cancel the registration of strychnine, but dress their FIFRA claim in the clothing of the APA and federal environmental statutes. Two of the plaintiffs, Sierra Club and Defenders of Wildlife, were parties to FIFRA administrative proceedings but chose to forgo appeal under FIFRA by failing to object formally to the March 1987 Notice of Intent to Cancel. Defendants therefore argue that plaintiffs' sole remedy is to petition the EPA to cancel the current registration and thereby obtain a judicially-reviewable decision. FIFRA, 7 U.S.C. § 136n. *Merrell v. Thomas,* 608 F.Supp. 644, 647 (D.Ore.1985), *aff'd* 807 F.2d 776 (9th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 145, 98 L.Ed. 2d 101 (1987) (FIFRA provides exclusive mechanism for canceling or suspending herbicide registration).

The intervenor-defendant in addition argues that the entire action should be dismissed for lack of jurisdiction or failure to state a claim since FIFRA provides plaintiffs' sole remedy. *Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 485 F.2d 780 (D.C.Cir.1973) (district court had no jurisdiction over FIFRA action pending in court of appeals); *Fiedler v. Clark,* 714 F.2d 77 (9th Cir.1983) (no private right of action under FIFRA).

Plaintiffs respond that Congress has neither expressly nor impliedly precluded judicial review under the APA of administrative action which touch on the registration of pesticides. *See, e.g., Sierra Club v. Peterson,* 705 F.2d 1475, 1478 (9th Cir. 1983) (FIFRA should not be read to preclude judicial review under APA). Plaintiffs argue that their choice to forgo a new FIFRA proceeding does not preclude this challenge based on the APA and other environmental statutes. They argue that the APA review provisions should be liberally construed to permit this challenge absent

---

14. This evidence has been compiled into an exhibit which will hereafter be referred to as the "non-target kill book." Plaintiffs' Appendix, volume II. It documents numerous strychnine kills over several decades. It cites, for example, 37 bald eagle, 17 golden eagle, and 5 peregrine falcon deaths since 1979 from primary or secondary strychnine poisoning.

15. Plaintiffs challenge defendants' characterization of this evidence as a "supplement to the administrative record." They argue that these documents were not before the agency when the challenged administrative actions were undertaken.

congressional limitations, and none are present here. *Japan Whaling Asso. v. American Cetacean Soc.*, 478 U.S. 221, 106 S.Ct. 2860, 2866, n. 4, 92 L.Ed.2d 166 (1986) (review of agency action under APA available absent convincing legislative intent to preclude review). Judicial review of agency action is favored, they argue, and this action is consistent with that goal.

Defendants' exhaustion claim relies strongly on the district court opinion in *Merrell v. Thomas*, 608 F.Supp. at 647, which held that a private action brought under NEPA was an improper vehicle to effect the cancellation of herbicides. *Merrell* did not hold, however, that failure to exhaust FIFRA proceedings precludes challenges based on statutes which provide an independent source of jurisdiction. The appellate opinion addressed that issue squarely:

> We do not hold that Merrell's conduct amounted to a failure to exhaust administrative remedies. If Merrell had sued to cancel or suspend pesticide registrations, such a holding might be appropriate on these facts. [citation omitted.] But Merrell sued instead to compel the EPA to comply with NEPA when registering pesticides under FIFRA. Faced with a similar suit against a different agency, we concluded that a plaintiff was not obliged to exhaust his statutory remedies, because 28 U.S.C. § 1331, NEPA, and section 10(a) of the Administrative Procedures Act, 5 U.S.C. § 702, combined to create an independent ground of jurisdiction. *Jones v. Gordon*, 792 F.2d 821, 824 (9th Cir.1986) (suit to set aside permit granted under the Marine Mammal Protection Act of 1972 because no EIS had been prepared). On that basis, we reach the merits in this case.

*Merrell*, 807 F.2d at 782 n. 3

The situation presented here is similar. Plaintiffs do not seek directly to cancel registrations under FIFRA. Rather, they want to require defendants to comply with the APA, as well as the ESA, MBTA, and BGEPA. Here, as in *Merrell*, there is an independent ground for jurisdiction, so plaintiffs need not exhaust administrative remedies.

Nor does the language of FIFRA expressly or impliedly preclude independent review. *Sierra Club v. Peterson*, 705 F.2d at 1478 (silence in FIFRA should not be read to preclude judicial review under the APA). "[T]he rule is that the cause of action for review of [agency action under the APA] is available absent some clear and convincing evidence of legislative intent to preclude review." *Japan Whaling Asso.*, 106 S.Ct. at 2866, n. 4, (citing *Block v. Community Nutrition Institute*, 467 U.S. 340, 345, 104 S.Ct. 2450, 2453–54, 81 L.Ed.2d 270 (1984)); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); A careful review of the statute and opinions which have examined it reveals no indication that Congress intended FIFRA to preclude separate review of agency action under the APA or other statute. *Accord Sierra Club v. Peterson*, 705 F.2d at 1478.

As part of their exhaustion challenge, defendants also assert that the agency actions challenged here are not final and not amenable to review. Defendants argue that there is no final EPA action because plaintiffs have not sought reversal of the March 1987 Notice. Plaintiffs, in contrast, urge that either the 1986 settlement or the March 1987 Notice was a sufficiently final action to permit this challenge.

■ In order for plaintiffs' APA challenge to proceed, the challenged action must be final within the definition of the APA. Courts have interpreted the finality element in a pragmatic way. *See F.T.C. v. Standard Oil Co. of Calif.*, 449 U.S. 232, 239–40, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980). Factors to consider include whether the agency action is a threshold inquiry or has status of law and imposes definite and immediate impact on petitioner and whether the legal issues are fit for judicial resolution. *Id.* at 239–43, 101 S.Ct. at 493–95. A major consideration in determining finality is the legal or practical effect on the party seeking judicial review. *See Id.*, at 243, 101 S.Ct. at 494–95.

■ Many of the reasons often cited for delaying judicial review are absent here. There is no indication that further administrative proceedings are necessary for the EPA to "correct its mistakes" or "apply its expertise." [16] *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2466–67, 45 L.Ed.2d 522 (1975). Nor will judicial resolution of this dispute cause piecemeal litigation or promote other inefficiencies. *See F.T.C. v. Standard Oil,* 449 U.S. at 242–43, 101 S.Ct. at 494–95. The EPA finalized the terms of the 1986 settlement by publishing the March 1987 Notice. Other than the recent request for a biological opinion from the FWS, there are no pending agency proceedings. The consultation began well after this litigation started, perhaps in response to it. The APA challenges before the court therefore present issues of law fit for judicial resolution. Considering all the circumstances, defendants' actions are final within the meaning of APA, 5 U.S.C. § 704, and therefore subject to review. Defendants' motion to dismiss for failure to exhaust administrative remedies should therefore be denied.

### III.

Defendants argue that plaintiffs lack standing to bring this action. They assert that plaintiffs suffer no particularized injury which is traceable to the EPA actions challenged here. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). They also claim that although plaintiffs are interested in studying and conserving endangered species, the intensity of plaintiffs' interest alone is not enough to confer standing. *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). They argue that no

injury resulted from the March 1987 Notice since it imposed greater restrictions against strychnine use than existed in the past. Further, the alleged strychnine-related deaths are not traceable to the EPA action contested here.

Plaintiffs respond that they are proper parties to raise claims under environmenal statutes and to challenge the defendants' administrative actions leading up to the 1986 settlement and the March 1987 Notice. Plaintiffs claim they meet the prerequisites to standing under Article III of the Constitution: they have suffered an injury in fact which is traceable to the defendants' actions and redressable by the relief sought. *See Valley Forge,* 454 U.S. at 471–72, 102 S.Ct. at 757–59; *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). They argue that their injury is their impaired ability to study, observe, and enjoy wildlife, caused by non-target strychnine poisoning. Plaintiffs argue further that their claims alleging illegal administrative actions fall within the zone of interests protected by each statute under which they proceed. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 156, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970); *Clarke v. Securities Industry Assn.,* 479 U.S. 388, 107 S.Ct. 750, 754–55, 93 L.Ed.2d 757 (1987), (standing to make APA challenge is construed broadly and accrues to persons aggrieved by agency action).

■ When standing is challenged based on allegations in the pleadings, the court "accept[s] as true all material allegations of the complaint, and construe[s] the complaint in favor of the complaining party." *Pennell v. City of San Jose,* —— U.S. ——, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988), (*quoting Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Apply-

---

16. Plaintiffs participated vigorously in the RPAR process and consistently made their positions known. Defendants rejected plaintiffs' arguments and settled the challenge to the 1983 Notice over plaintiffs' objections. Defendants argue that plaintiffs should have petitioned to begin anew the RPAR process which had just been completed after a ten year period. View-

ing plaintiffs' situation pragmatically, further administrative challenge would have been futile. Carrying defendants' argument to its extreme, plaintiffs would never be entitled to judicial review since plaintiffs could repeatedly challenge any registrations through the RPAR process.

ing the constitutional standing requirements is not a mechanical exercise. *Allen v. Wright,* 468 U.S. at 751–52, 104 S.Ct. at 3324–25. Rather, the court's function is to assure that the issues before it are resolved "not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. Here, the specific injuries complained of are the improper registration of strychnine and the continued taking of protected species.[17] Defendants argue that plaintiffs suffer no injury because the current registrations of strychnine are more strict than had previously been in place. Plaintiffs respond that the procedures used to adopt these regulations were improper and that the regulations continue to permit illegal taking of protected species.

■ There are two central allegations in the complaint. They first claim that the EPA reversed, without adequate explanation or scientific support, the decision to ban most above-ground uses of strychnine rodenticide. They also argue that any continued registration will inevitably cause mortality to protected species, resulting in predictable and avoidable deaths, possibly even contributing to extinction.[18] Plaintiffs therefore allege that defendants' conduct directly impairs their organizational purposes of study, enjoyment, and advance-

ment of protected species.[19] This injury will be avoided if the restriction suggested in P.D. 2/3 and P.D. 4 are imposed. Plaintiffs therefore meet the constitutional prerequisites to standing.

■ An additional standing requirement is generally imposed upon plaintiffs seeking relief under the APA. The APA "grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.'" *Camp,* 397 U.S. at 153, 90 S.Ct. at 830 (*quoting* APA, 5 U.S.C. § 702). This requires inquiry into whether the "interest sought to be protected ... [is] arguably within the zone of interests to be protected or regulated by the statute...." *Data Processing,* 397 U.S. at 153, 90 S.Ct. at 830. The "zone of interests" test should be broadly construed, *Clarke,* 107 S.Ct. at 756–57. To determine the zone of interest protected by a statute, the court looks at the overall context of the statute to derive congressional intent as to its scope, *Id.* 107 S.Ct. at 758. "The essential inquiry is whether Congress 'intended for a particular class of plaintiffs to be relied on to challenge the agency disregard of the law.'" *Id.,* 107 S.Ct. at 757, *quoting Block v. Community Nutrition Institute,* 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed. 2d 270 (1984).

The plaintiffs here raise an APA challenge in conjunction with three substantive

---

**17.** The injury giving rise to standing may reflect "aesthetic, conservational, and recreational [values] as well as economic values." *Camp,* 397 U.S. at 154, 90 S.Ct. at 830. Non-economic injury to aesthetic and environmental well-being is a sufficient injury to confer standing if the plaintiff is adversely affected. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

**18.** At the hearing the parties agreed that the California condor no longer exists in the wild. The last wild condors were taken captive in hopes that a captive breeding program might increase the population. The non-target kill book attributes five condor deaths to strychnine poisoning, in 1950 and 1966, although it does not state that the strychnine involved was placed as part of a rodent control program.

The parties also agree that the only known black-footed ferret colony, numbering 19 animals, was taken into captivity in Wyoming in

the 1970's to attempt captive breeding. Neither side disputes that strychnine used for rodent control poses a threat to any nearby ferrets, if any exist in the wild.

**19.** An association has standing on behalf of its members if: "'(a) [its] members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.'" *International Union, Auto. Aerospace & Agricultural Implement Workers v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 2529, 91 L.Ed.2d 228 (1986) (quoting *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). *See Alaska Fish & Wildlife Federation v. Dunkle,* 829 F.2d 933, 937–38 (9th Cir.1987). Defendants do not contest plaintiffs' organizational standing, and plaintiffs meet the three prerequisites.

environmental statutes—the ESA, the MBTA, and the BGEPA. Each of the environmental statutes is concerned with conserving protected species from a wide variety of harm. Each protects against the unauthorized taking alleged here. In addition, the ESA provides for private cause of action, which is further evidence of Congressional intent to permit this APA challenge. *See Clarke*, 107 S.Ct. at 757. Plaintiffs therefore come within the intended scope of these statutes and have standing to bring each of their claims for which they seek summary judgment. The motion to dismiss for lack of standing should be denied.

## IV.

Plaintiffs alleged that defendants violated the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* (1966), in several ways. The principal claim, however, is that the EPA's revocation of the 1983 Notice of Intent to Cancel was arbitrary and capricious and not in accordance with law, in violation of APA § 706.[20]

Plaintiffs recount the elaborate history of their administrative challenge. They argue that over the course of several years the EPA published three formal position statements—P.D. 1, P.D. 2/3, and P.D. 4. Each considered the potential detriment to endangered species from continued aboveground strychnine use. These position documents suggested an outright ban on registrations of strychnine for control of prairie dogs and meadow mice, and suggested label restrictions for ground squirrel control, along with further study on the efficacy of continued use. *See* P.D. 4, at i-ii. Plaintiffs argue that the concern for endangered species demonstrated by the EPA was not limited to the severely endangered black-footed ferret. However, in plaintiffs' view, the 1986 settlement reversed the EPA's well-founded recommendation for severe limitations on strychnine use. This reversal was based solely on one FWS study limited only to black-footed ferrets.

Plaintiffs describe this as caving in to agricultural interests, and an "end-run" around plaintiffs' refusal to agree to the settlement. They allege that the EPA avoided holding an administrative hearing where plaintiffs' challenges could be aired. Plaintiffs claim, therefore, that the EPA violated the APA when it failed adequately to justify with scientific data the lenient restraints agreed to by the settlement, and formalized by the 1987 Notice.

Defendants respond that plaintiffs' reliance on the APA is unfounded. They assert that APA review is precluded because FIFRA provides for judicial review. *See Califano v. Sanders*, 430 U.S. 99, 105–07, 97 S.Ct. 980, 984–85, 51 L.Ed.2d 192 (1977) (Social Security Act provides exclusive method of judicial review).[21] Defendants also assert that adoption of the March 1987 Notice was not rulemaking under APA, 5 U.S.C. § 551. Defendants' principal argument is that even if the APA applies, the EPA's actions withstand review because they were rationally undertaken and accompanied by well-reasoned analysis. They urge the court to adopt the position stated in *National Audubon Society v. Hester*, 801 F.2d 405 (D.C.Cir.1986) (reversed district court injunction against bringing remaining wild California condors into captivity), where the court noted:

> The question for reviewing courts is not whether an agency decision is "correct," but rather whether the decision reflects sufficient attention to environmental concerns and is adequately reasoned and explained.

*Id.* at 407 (citations omitted). Defendants argue that their duty under FIFRA, as well as ESA, MBTA, and BGEPA, is to consider the agency's impact on protected species, as well as the overall environment, when undertaking pesticide registration. They claim that the major concern with strychnine registration has always been potential jeopardy to the black-footed ferret. However, after P.D. 4 was published, they ar-

---

**20.** Plaintiffs' other APA claims based on alleged illegal takings in violation of environmental statutes are discussed elsewhere.

**21.** As discussed previously, plaintiffs may maintain this action without raising claims under FIFRA.

gue, the FWS determined that potential jeopardy to ferrets could be avoided by pre-control surveys and label restrictions. Thus, the March 1987 Notice permitting continued strychnine use was rationally based and well-founded on scientific evidence.

█ Defendants' assertions that the strychnine registration process is not rulemaking governed by APA, 5 U.S.C. § 551, must be rejected. Defendants' administrative actions have been conducted in a manner consistent with informal rulemaking. They have solicited public comment, sought expert consultation, and then published the resulting policies in the Federal Register. The strychnine registration process has affected a wide variety of people, not only particular registrants. Review under APA, 5 U.S.C. § 706 is therefore available absent legislative intention to preclude review.[22] *Japan Whaling,* 106 S.Ct. at 2866 n. 4. The record for review consists of the record before the agency at the time the challenged actions were taken. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

The agency action principally challenged here is what plaintiffs characterize as an "about face" by the EPA from a proposed near-absolute ban on strychnine, to a regulation permitting continued use. The emphasis of each of the EPA position documents was concern for the effects of strychnine on non-target species. The status of "likely jeopardized" by continued use was assigned to numerous endangered species. In its position documents the EPA stated that its intended course was to ban most registrations. In contrast, the 1986 settlement agreement and March 1987 Notice noted concern almost exclusively for the black-footed ferret. This narrow focus was a departure from the EPA's prior policy.

█ When an agency changes course by reversing a policy, it must supply a reasoned analysis for the change. *Motor Vehicle Mfgr. Asso. v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). When reviewing such a change of policy under the APA, a court first must determine whether an explanation was made, and then "address the sufficiency of [the explanation] under the 'arbitrary and capricious' standard." *Sierra Club v. Clark,* 755 F.2d 608, 619 (8th Cir.1985).

█ In this instance the change in policy embodied by the 1986 settlement and March 1987 Notice is based upon a revised assessment of likely jeopardy to the black-footed ferret. The EPA's explanation is stated in the March 1987 Notice:

A. Risk Determination

In the Strychnine cancellation notice, EPA referred to Position Documents 2/3 and 4 (PD # 2/3, PD # 4), in which the Agency set forth in detail its assessment of the risks and benefits associated with the outdoor, above-ground use of strychnine. Generally, the Agency determined that, in light of modest benefits, certain of these uses of strychnine caused unreasonable adverse effects on the environment because of the risks they pose to nontarget species. Specifically, the Agency determined that strychnine used to control prairie dogs and ground squirrels would jeopardize the continued existence of the black-footed ferret, an endangered species.

The Agency identified strychnine as highly toxic to all carnivores upon which it had been tested and determined that it was prudent to assume that strychnine would be highly toxic to black-footed ferrets as well. The agency also determined that black-footed ferrets were likely to feed on prairie dog and ground squirrel carcasses that had been poisoned with strychnine and that under certain field conditions they would die from secondary poisoning. Furthermore, the Agency was informed by the U.S. Office of Endangered Species (OES) in a "jeopardy opinion" that conducting a pre-control black-footed ferret survey to determine the presence of black-footed ferrets

---

**22.** The reviewing court shall ... (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law....

5 U.S.C. § 706.

was not sufficient safeguard to permit strychnine treatment in its habitat. During the course of the settlement negotiations, however, OES reconsidered its original "jeopardy opinion." Based upon further experience with black-footed ferret survey techniques and their reliability in locating ferrets in the Meeteetsee Wyoming black-footed ferret population, OES determined that if no ferrets were found in a pre-control black-footed ferret survey conducted according to OES survey guidelines and the requirements of the Notice, strychnine could be used to control prairie dogs and ground squirrels without jeopardizing the continued existence of the black-footed ferret.

March, 1987 Notice, 52 Fed.Reg., at 6763. The EPA stated that it considered three options in response to the new ferret information: a) continued registration of strychnine for above-ground use with no further restrictions; 2) continued registration with modifications; and 3) cancellation of all registrations. The EPA summarized its decision:

> EPA has, therefore, decided to adopt option 2. Despite relatively low benefits associated with the use of strychnine-containing pesticides for prairie dog, ground squirrel, and meadow mouse control, they outweigh the even lower risk to the black-footed ferret from secondary poisoning if the terms and conditions of registration are modified in accordance with this Notice.

March 1987 Notice; 52 Fed.Reg. at 6764.

Nowhere in the explanation does the EPA note that all previous position documents had found likely jeopardy to numerous endangered species.[23] Rather, the EPA instead portrays its previous position as inspired solely out of concern for the black-footed ferret. That explanation is contradicted by the extensive record of pre-settlement statements by the EPA. Except for the 1984 ferret study, the record is devoid of any biological opinion or other scientific evidence reversing the finding of likely jeopardy to all of the other endangered species cited in P.D. 2/3 and P.D. 4. The reversal of agency policy was apparently undertaken, therefore, without an adequate scientific basis and without considering the entire problem.[24] "Normally an agency rule [is] arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency...." *Motor Vehicle*, 463 U.S. at 43, 103 S.Ct. at 2867. By this standard, the 1986 settlement and March 1987 Notice were arbitrary and capricious agency actions.

■ An agency also violates APA, 5 U.S.C. § 706(2)(a) if it its action is "not in accordance with law." Defendants continuing registration of strychnine violates ESA, 16 U.S.C. § 1536(b)(4), which permits an "incidental take" only upon prior authorization of the Secretary of the Interior.[25]

The EPA apparently has never obtained "incidental take" statements from the FWS, and implicitly acknowledges this in

---

**23.** *See, supra* p. 1339 which notes the species considered likely jeopardized by continued strychnine registration.

**24.** Defendants argue that the March 1987 Notice contained safeguards directed at protecting more endangered species than just the black-footed ferret. Defendants apparently refer to label statements which caution users to avoid using baits in areas potentially inhabited by enumerated endangered species. *See* March 1987 Notice, 52 Fed.Reg., at 6765. There is no evidence in the record, however, indicating that such label notices are sufficient to avoid likely jeopardy to these species. Nor does the EPA provide any such explanation.

**25.** Before an agency may take any action which results in the taking of an endangered or threatened species incidental to the agency action, the agency must receive from the appropriate wildlife agency a written statement that:

> (i) specifies the impact of such incidental taking on the species,
> (ii) specifies those reasonable and prudent measures that the Secretary considers necessary to minimize such impact, [and]
>
> .   .   .   .   .
>
> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency....

16 U.S.C. § 1536(b)(4). (1986).

its recent request to reinitiate formal (Section 7) consultations. EPA letter to FWS, Sept. 16, 1987. EPA Exhibit 359, (attachment to defendants' memoranda, entitled "Supplement to Administrative Record."):

[EPA] expects that the Fish and Wildlife Service will include an "incidental take" statement as provided for in recent admendments to the Endangered Species Act. We realize that reinitiation of consultation is required to determine the allowable level for incidental take.

By acknowledging that continued registration may result in incidental taking of endangered species, yet finalizing the registration before receiving FWS approval, the defendants have engaged in agency action "not in accordance with law" in violation of APA § 706. Injunctive relief is appropriate to remedy these violations.

## V.

The BGEPA, 16 U.S.C. § 668, protects bald eagles and golden eagles from a wide variety of harms.[26] The MBTA 16 U.S.C. § 703 *et seq.*, similarly prohibits the taking, except by permit, of any migratory bird protected by several international treaties.[27] Plaintiffs' contention is that the continued registration of strychnine for above-ground use over the ranges of migratory birds and eagles constitutes a taking in violation of these statutes. They argue that the prohibition is broad-reaching and applies no less to government agencies than to private parties. They claim the taking by strychnine is documented in the strychnine non-target kill book. Therefore, defendants' actions which result in illegal takings are arbitrary and capricious, and otherwise not in accordance with the law, in violation of APA, 5 U.S.C. § 706(2).

Defendants respond that counts 4 and 5 of the complaint alleging violations of BGEPA and MBTA should be dismissed under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. They argue that both of these statutes are primarily law enforcement and wildlife management statutes. The statutes are enforced by government actions seeking criminal or civil penalties, but neither grants express or implied private right of action to these plaintiffs. *Citizens Against Toxic Sprays, Inc. v. Bergland,* 428 F.Supp. 908, 938 (D.Ore. 1977) (no private action under BGEPA); *See California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (no private cause of action in Rivers and Harbors Act). Defendants argue that enforcement of these statutes is committed solely to agency discretion and judicial review is unavailable. *See Heckler v. Chaney,* 470 U.S. 821, 838, 105 S.Ct. 1649, 1659, 84 L.Ed.2d 714 (1985) (agency decision not to institute enforcement action not reviewable under APA).

Plaintiffs agree that they are not entitled to assert a private cause of action under either statute. They argue, however, that each statute, in conjunction with the APA, provides an independent source of jurisdiction for review of agency actions which conflict with either statute. *See Alaska Fish and Wildlife Federation and Outdoor Council, Inc. v. Dunkle,* 829 F.2d 933, 938 (9th Cir.1987) (agency action in violation of MBTA reviewable under APA, 5 U.S.C. § 706); *Defenders of Wildlife v. Andrus,* 428 F.Supp. 167 (D.D.C.1977) (FWS regulations permitting twilight hunting violated ESA and so were arbitrary and capricious in violation of APA, 5 U.S.C. § 706). *Cf. Merrell v. Thomas,* 807 F.2d 776, 782, n. 3 (9th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 145, 98 L.Ed.2d 101 (1987) (NEPA and APA combine to form independent bases for jurisdiction).

While neither the BGEPA nor the MBTA provide for private actions, agency

---

**26.** [Whoever shall] take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, ... any bald eagle ... or any golden eagle, alive or dead ... [shall be subject to criminal and civil penalties]. 16 U.S.C. § 668(a) and (b).

**27.** [Except as permitted by regulations, it] shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture or kill, possess, offer for sale, sell, offer to barter, [etc.] ... any migratory bird [protected by treaty] and birds in danger of extinction.... 16 U.S.C. § 703.

action which violates either statute is subject to challenge under the APA.[28] Relief is limited to declaratory and injunctive remedies.

■ In *Heckler v. Chaney*, the Supreme Court summarized the types of agency action reviewable under the APA, and the narrow exceptions to such review:

The APA's comprehensive provisions for judicial review of "agency actions," are contained in 5 U.S.C. §§ 701–06. Any person "adversely affected or aggrieved" by agency action; see § 702, including a "failure to act," is entitled to "judicial review thereof," as long as the action is a "final agency action for which there is no other adequate remedy in a court," see § 704. The standards to be applied on review are governed by the provisions of § 706. But before any review at all may be had, a party must first clear the hurdle of § 701(a). That section provides that the chapter on judicial review "applies, according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

*Id.*, 470 U.S. at 828, 105 S.Ct. at 1654. The defendants' alleged violations of the MBTA

and BGEPA are therefore reviewable under the APA unless review is statutorily precluded or the action is committed to agency discretion by law. Neither of these exceptions is present here. Neither statute expressly precludes review. Furthermore, the alleged prohibited taking of protected species through federal agency action is not the type of enforcement action for which the agency should retain absolute discretion. *Compare Merrell v. Thomas*, 807 F.2d 776 (9th Cir.1986), *cert. denied*, —— U.S. ——, 108 S.Ct. 145, 98 L.Ed.2d 101 (1987) (plaintiffs not precluded from challenging EPA's failure to comply with NEPA when registering pesticides) with *Heckler v. Chaney*, 470 U.S. at 838, 105 S.Ct. at 1659 (exception to reviewability of agency action remains narrow, but includes agency refusal to institute investigation or enforcement proceedings against individuals). Investigation and enforcement decisions by the defendants are not at issue here. Therefore plaintiffs are entitled to proceed to the merits of their claims.

■ Plaintiffs contend that the continued registration of strychnine constitutes a taking of protected species in violation of these Acts.[29] The unrebutted non-target

---

**28.** The distinction between a private right of action and judicial review under the APA (of agency action taken in violation of a statute) is discussed in Timbers and Wirth, *Private Rights of Action and Judicial Review in Federal Environmental Law*, 70 Cornell L.Rev. 403 (1985).

**29.** The BGEPA protects bald eagles and golden eagles. The MBTA protects numerous migratory and endangered birds. Plaintiffs allege that illegal taking of birds protected by the MBTA has occurred to the following species, as documented in the non-target kill book:
bald Eagle
golden eagle
peregrine falcon
California condor
blackbird
blackbird, grack
blackbird, redwing
blackbird, rusty
blackbird, brewer
bluebirds
bluejay
bluejay, steller's
cardinal
coot
cowbird
dove, mourning

finch
finch, gold
finch, house
finch, purple
gull, black-back
gull, glaucous
gull, herring
gull, ringbilled
junco
kildeer
lark, horned
meadow lark
magpie
mallard duck
nuthatch
pigeon
lark sparrow
green towhee
wood duck
falcon, prairie
gyrfalcon
hawks
hawk, Swainsons
hawk, marsh
hawk, redtailed
hawk, roughlegged
owl, barn
owl, great horned

kill book data reveals that numerous strychnine-caused deaths have occurred to protected species. Under both Acts, taking of protected species is permitted only pursuant to prior approval by the Secretary of the Department of the Interior.[30] Defendants acknowledge that they were aware of much of the non-target kill book data long before it was compiled and submitted to them by plaintiffs. No prior authorization for this taking is presented by defendants. The record does not conclusively show that the extensive poisonings documented by plaintiffs are all attributable to above-ground grain baits placed for rodent control.[31] The threat to protected birds is readily apparent, however, and unrebutted by defendants. No one denies that strychnine is intended to serve as a poison or that it can cause mortality to non-target species which ingest it. Several of the necropsy reports in the record note that strychnine-laced grain was found in the digestive tract of poisoned birds. There is no evidence that the methods of application recommended by the EPA will eliminate these non-target kills. Defendants' continued registration of strychnine, resulting in death to protected birds, therefore violates both Acts and should be enjoined.

## VI.

■ The Endangered Species Act of 1973, (ESA) 16 U.S.C. § 1531–§ 1543, is designed to conserve and promote endangered and threatened species.[32] The protections take many forms, one is ESA, 16 U.S.C. § 1538, which broadly prohibits any form of "taking" of any endangered species.[33] Federal agencies must also assure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or modification of habitat [critical to the species]." 16 U.S.C. § 1536(a)(2).

In order to prevent such harm, the ESA requires agency consultation with designated wildlife agencies. 16 U.S.C. § 1536(a)(2) (Section 7 consultation). In this case, the EPA was required to consult with the FWS to determine if the proposed registrations of strychnine would likely affect any endangered or threatened species. The FWS determined that 18 species were likely to be jeopardized by continued above-ground strychnine use. EPA Ex. No. 65. The FWS also proposed alternatives to avoid potential jeopardy, which the EPA used to formulate its Position Documents. *See* P.D. 4, at ii.

In May 1984 the EPA conducted a renewed Section 7 consultation which superseded the March 1, 1979 biological opinion as to the black-footed ferret. Then on September 16, 1987, the EPA again reinitiated Section 7 consultations in response to the non-target kill book. It appears that that consultation is ongoing and that no biological opinion has been issued.

Plaintiffs' ESA claims challenge three distinct violations by the defendants. First, plaintiffs allege that defendants have failed to "conserve and promote" protected species as required by 16 U.S.C. § 1531(c)(1) and § 1536(a)(1)[34] (Count 2).

---

owl, snowy
gallinule
goose, Canada

**30.** Under the MBTA, 16 U.S.C. § 704, the Secretary may authorize the taking of protected birds after adopting appropriate regulations.

The BGEPA permits the Secretary to authorize a taking under several circumstances, including to protect agricultural interests. 16 U.S. C. § 668a.

**31.** It may be impossible to make a conclusive showing of the source of strychnine causing each kill due to the nature of strychnine use in remote areas.

**32.** List of species protected by the ESA is published at 50 C.F.R. § 17.11.

**33.** The prohibition against taking is broadly construed to prohibit nearly any activity which might adversely affect protected species. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir.1987).

**34.** § 1531(c)(1) states:

It is ... the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in the furtherance of the purpose of this chapter. § 1536(a)(1) states:

The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in

Second, they assert that the EPA failed timely to renew formal Section 7 consultations with the FWS after the non-target kill book was presented (Count 3). Third, plaintiffs allege that the continued registrations result in illegal taking of protected species in violation of the ESA (Count 1). Agency actions are reviewed under the standards set forth in APA, 5 U.S.C. § 706. They may be set aside if arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. *Sierra Club v. Marsh*, 816 F.2d at 1384.

## A.

Plaintiffs allege that defendants have engaged in brinksmanship and violated their duty to conserve and promote endangered species by not opposing changes to the 1983 Notice of Intent to Cancel. They argue that Congress intended to halt and reverse the trend towards species extinction, whatever the cost. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184, 98 S.Ct. 2279, 2296–97, 57 L.Ed.2d 117 (1978) [35] (ESA prohibited completion of dam which would eradicate the endangered snail darter fish). Plaintiffs claim that the duty to conserve is enforceable against federal agencies. *Carson–Truckee Water Conservancy Dist. v. Clark*, 741 F.2d 257, 261 (9th Cir.1984), *cert. denied*, 470 U.S. 1083, 105 S.Ct. 1842, 85 L.Ed.2d 141 (1985) (duty to conserve endangered species is imposed on Secretary of Interior).

Defendants respond that the agency has broad discretion in deciding what conservation methods are appropriate. The duty to conserve and promote is directed at protecting each species as a whole, not individual members. Defendants assert that they have gone to extraordinary lengths to avoid harm to endangered and threatened species. Each of the Position Documents and published Notices has discussed at length the defendants' concern for conser-

vation. Each statement has also made specific proposals to eliminate jeopardy. Defendants emphasize that the March 1987 Notice increased protection for endangered species to a level greater than existed previously. Moreover, defendants assert that they are working cooperatively with state agencies to increase the population of black-footed ferrets, and have recently reinitiated consultation with the FWS, regarding possible jeopardy to other species.

Plaintiffs have brought this "failure to conserve and promote" claim as a general procedural challenge against defendants' actions. In reviewing the actions of a federal agency it is not the court's role to substitute its judgment for the agency's, particularly in areas which require the application of agency expertise. *See, e.g., Heckler v. Chaney*, 470 U.S. at 831, 105 S.Ct. at 1655–56. Courts generally should "defer to an agency's construction of a statute it is charged with implementing and to the procedures it adopts for implementing that statute." *Id.* at 832, 105 S.Ct. at 1656 (*citing Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)).

Reasonable people could disagree as to the proper level of activism required by an agency under the ESA. The court will not substitute its judgment for the agency's in deciding as a general matter that the totality of defendant's actions taken to protect threatened and endangered species were insufficient. This does not preclude the court from addressing claims alleging specific violations of the ESA by discrete acts or failures to act. The defendants' actions as a whole, however, do not constitute an arbitrary and capricious failure to conserve and promote threatened and endangered species.

consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the *conservation* of endangered species and threatened species listed pursuant to section 1533 of this title. (emphasis added).

**35.** Superseded by statute, Energy and Water Development Appropriations Act of 1979, Pub.L. 9569 93 Stat. 437, authorizing impoundment of the Tellico reservoir notwithstanding any other law.

### B.

■ Plaintiffs allege that defendants did not timely reinitiate Section 7 consultations with the FWS in response to the data received in the non-target kill book. They argue that assessments of "no jeopardy" were assigned to bald eagles and peregrine falcons in the FWS's 1979 biological opinion because there was no evidence of strychnine-induced mortality. EPA Ex. No. 65, at 6–7. Evidence of such deaths from strychnine was provided in January 1987 in the non-target kill book. Plaintiffs claim therefore that defendants' failure to reinitiate Section 7 consultations before publishing the March 1987 Notice violated EPA Section 7, 16 U.S.C. § 1536(a)(2).

Defendants respond that the "no jeopardy" determination in the 1979 biological opinion was an informed judgment based upon autopsy evidence from numerous eagles. Strychnine was not implicated as the cause of death in any instance. Nor was there evidence of strychnine-induced mortality to peregrine falcons. Jeopardy was assessed for other species, and appropriate precautions were imposed. Defendants further argue that they have now reinitiated Section 7 consultations with the FWS in response to the non-target kill book data and plaintiffs' failure to consult claim should be dismissed. They also argue that any challenge directed against the ongoing consultation is not ripe for review since the FWS has not yet issued a biological opinion.

Plaintiffs reply that the reinitiation of formal consultation occurred in September, 1987, nine months after the non-target kill book data was received, and after defendants filed their administrative record in this action. They characterize the new consultation as defendants' attempt to "back and fill" the administrative record.

The ESA does not specify the time within which an agency must reinitiate consultation and the agency is entitled to deference in decisions such as this. While the ESA does heighten the agency's duty to respond when jeopardy is possible to an endangered species, the delay of several months in these circumstances was not arbitrary or capricious. Formal consultations are now underway, and the concerns raised by plaintiffs, particularly to bald eagles and peregrine falcons, will be addressed. Review would be premature and the outcome of the ongoing consultations is uncertain. Accordingly, defendants' motion for summary judgment on count 3 should be granted. Plaintiffs' claims under Section 7 of the ESA, count 3 of the complaint, should be dismissed.

### C.

■ Plaintiffs allege that the continued registration of strychnine for above-ground use in areas inhabited by endangered and threatened species results in the taking of these species in violation of ESA Section 9, 16 U.S.C. § 1538(a)(1)(B). They claim that the restrictions imposed by the ESA are extremely strict, and cannot be violated by any person or entity, including a federal agency, even to obtain a desirable result. *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117; *Sierra Club v. Marsh,* 816 F.2d at 1385. Plaintiffs assert that courts have little discretion in enjoining violations of the ESA because of the strong presumption in favor of preserving species. They also argue that defendants violate the Act by not obtaining "incidental take" statements from the FWS before taking protected species.

Defendants respond that as a matter of law no taking occurs when an agency registers a rodenticide for lawful use by private persons. They argue further that continued use of strychnine as currently registered will avoid harm rather than cause harm to endangered species. Any impermissible use which results in death to a protected species will be prosecuted, and a warning to that effect is given on all strychnine products.

The protections afforded threatened or endangered species by section 9 of the EPA are substantial. The prohibition against "taking" is broadly defined in the statute, 16 U.S.C. § 1532(19), and expansively construed. *See Palila v. Hawaii Department of Land and Natural Resources,* 639 F.2d 495, 497 (9th Cir.1981). A violation of sec-

**1354**

tion 9 can be attributed to federal agency action (or inaction) even when the agency does not directly cause the harm. *See, e.g., Sierra Club v. Marsh,* 816 F.2d at 1385 (Army Corps of Engineers' reliance on state to implement protective measures did not relieve Corps' burden to avoid jeopardy to endangered species under ESA).

▮ In both the EPA administrative record and the more ample record now before court there is unrebutted evidence of strychnine kills among endangered species protected by the ESA. Defendants acknowledge this evidence, but discount it: "[O]nly a small, probably insignificant, number of endangered species have died from secondary strychnine poisoning. There is no evidence that there [sic] unfortunate deaths resulted from the agency action at issue in this case." Defendants' Memorandum in Opposition to Plaintiffs' Motion, at 38.[36] Defendants also argue that plaintiffs cannot show "either that [bald eagle] deaths are likely under the carefully controlled above-ground strychnine use now in effect, or that additional incidents are likely to occur in the future." Defendants' Memorandum in Support, at 59, n. 58.

The strong statutory presumption in the ESA is preservation of endangered species, however, even when the practical cost is extraordinary. *See, e.g., TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117. There is no level of threat to endangered species that can be deemed "insignificant" absent an incidental take statement. *See* 16 U.S.C. § 1536(b)(4).

Defendants cite no scientific evidence that strychnine use as currently permitted will prevent kills such as have occurred in the past. Nothing in the record indicates the safety or efficacy of the currently registered bait system as to any species except the black-footed ferret. There is no evidence that the ground squirrel study required by P.D. 4 was ever undertaken to

determine the lowest bait concentration needed to provide control. *See* P.D. 4 at 42. With the exception of one FWS study limited exclusively to ferret jeopardy, the last scientific study was conducted in 1979. The biological opinions, incorporated in P.D. 2/3 and P.D. 4, do not approve the current registration program, but in fact note likely jeopardy to numerous species and recommend severe restrictions on strychnine use. On these grounds, the 1986 settlement and March 1987 Notice cause an illegal and ongoing taking of endangered species.

Moreover, the EPA also has implicitly acknowledged the taking of endangered species in its September 16, 1987 request for Section 7 consultations. As noted previously, the EPA has a pending request for an "incidental take" statement to determine the lawful level of incidental taking which may result from strychnine registration. Such "incidental taking" may only occur after FWS authorization. 16 U.S.C. § 1536(b)(4) (1982). The strychnine registrations currently in place are deficient since they may cause impermissible "incidental takings" in violation of the Act; they should therefore be enjoined.

## VII.

▮ Plaintiffs seek a variety of declaratory and injunctive relief, and attorney's fees. Their claims under the APA, MBTA, and BGEPA all allege agency procedural violations under 5 U.S.C. § 706. Declaratory and injunctive relief is available for such violations, but any injunction should be tailored to remedy the precise violation by the agency.

Plaintiffs are entitled to a declaration that defendants violated the APA by adopting the March 1987 Notice without adequate explanation and supporting evidence. The appropriate injunctive relief in this instance should address the specific shortcomings in defendants' actions while retaining those portions of the current registra-

---

**36.** Defendants do not dispute the accuracy of the non-target kill book data. Nor have they submitted any rebuttal evidence on that point to create a genuine dispute as to that data. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (upon motion for summary judgment responding party must present affirmative rebuttal evidence to create genuine issue of disputed fact).

tions which enhance protection of endangered species. Plaintiffs are also entitled to a declaration that defendants' current registrations of strychnine for above-ground use result in impermissible taking of birds protected by the MBTA and the BGEPA, in violation of 5 U.S.C. § 706. Injunctive relief is appropriate to enjoin the continuing violations.

■■■ Plaintiffs' ESA claims are distinct from the other claims in that the ESA provides for citizen suits, and the court's jurisdiction is independent of the APA. 16 U.S.C. § 1540(g). A variety of relief is available to private parties who sue to vindicate the Act, including the declaratory and injunctive relief and attorney's fees sought here. When an injunction is sought under the ESA, the traditional balancing of equities is abandoned in favor of an almost absolute presumption in favor of the endangered species. *See TVA v. Hill,* 437 U.S. at 173, 98 S.Ct. at 2291. *Sierra Club v. Marsh,* 816 F.2d at 1383. The declaratory and injunctive relief provided here under the ESA is aimed at redressing defendants' violations of Section 9 of the ESA.

## ORDER

Accordingly, based on the above and all the files, records and proceedings here, IT IS HEREBY ORDERED that:

1. Defendants' and intervenor-defendant's motion to dismiss or for summary judgment on counts one, four, five and seven of plaintiffs' complaint is denied.

2. Defendants' and intervenor-defendant's motion to dismiss count six of the complaint is granted, and count six is dismissed with prejudice.

3. Plaintiffs' motion to dismiss count six without prejudice is denied.

4. Defendants' and intervenor-defendant's motion for summary judgment on counts two and three is granted, and these counts are dismissed.

5. Plaintiffs' motion for summary judgment on counts one, four, five and seven is granted, and judgment should be entered in their favor on these counts.

6. Plaintiffs are entitled to declaratory relief, and it is therefore hereby declared and adjudged that:

The failure of the Administrator of the EPA to implement the 1983 Notice of Intent to Cancel, 48 Fed.Reg. 48522 (1983) and implementation instead of the March 1987 Notice, 52 Fed.Reg. 6762 (1987) without adequate scientific evidence and public explanation, was arbitrary and capricious in violation of 5 U.S.C. § 706.

It is further declared and adjudged that:

The Administrator's continued registration of strychnine for above-ground use within the ranges of birds protected by the Migratory Bird Treaty Act (MBTA) and the Bald and Golden Eagle Protection Act (BGEPA) results in impermissible taking of birds protected by these Acts, in violation of 5 U.S.C. § 706.

It is further declared and adjudged that:

The Administrator is in continuing violation of ESA, Section 9, 1538(a)(B) by registering for above-ground use for ground squirrel, prairie dog and meadow mouse control, strychnine which might be used within an area also inhabited by any threatened or endangered species determined to be likely jeopardized or which has suffered a strychnine kill documented in the non-target kill book.

The Administrator also is in continuing violation of ESA by permitting strychnine use in a manner which may cause the incidental taking of an endangered or threatened species without prior authorization of the Secretary of the Department of the Interior as provided in 16 U.S.C. § 1536(b)(4).

7. Plaintiffs are entitled to injunctive relief as follows:

A. To remedy violations of the APA, the Administrator of the EPA and his agents shall retain the March 1987 Notice insofar as it prohibits and restricts strychnine registrations. They shall also temporarily impose the changes in registrations proposed by the 1983 Notice of Intent to Cancel for all registrations for ground squirrel, prairie dog and meadow mouse control to the extent that they restrict

strychnine use or enhance the protection to endangered and threatened species. This shall include the cancellation of registrations for prairie dogs and meadow mouse control. The Administrator shall reexamine the registrations for prairie dog, ground squirrel and meadow mouse control. If continued strychnine use is proposed, the Administrator or his agents must make findings regarding the adequate geographic area needed as a buffer between endangered or threatened species habitat and areas where strychnine use will be permitted. Any final notice, if it should permit continued above-ground strychnine use, shall explain how jeopardy will be avoided to each potentially jeopardized species noted in any Position Document. If label restrictions are relied on to decrease potential jeopardy, the Administrator and his agents must provide an explanation based on reasonable study of the practical value of label restrictions to prevent strychnine use in areas or by methods not permitted.

The temporary restrictions on registrations shall expire when the review is completed and a notice of determination is published.

B. To remedy violations of the MBTA and BGEPA, the Administrator and his agents are enjoined from continuing the registrations of strychnine for above-ground use as a pesticide or rodenticide within the ranges of the bald eagle and golden eagle unless the Administrator certifies that methods by which strychnine might be applied will not cause injury or death to any bald or golden eagle. This injunction shall not apply to any taking of eagles incidental to strychnine use, authorized by the Secretary of the Interior pursuant to 16 U.S.C. § 668a.

The Administrator of the EPA and his agents are enjoined from continuing the registrations of strychnine for above-ground use as a pesticide or rodenticide in a manner which may result in a non-target taking of the following migratory birds:

 bald eagle
 golden eagle
 peregrine falcon
 California condor
 blackbird
 blackbird, grack
 blackbird, redwing
 blackbird, rusty
 blackbird, brewer
 bluebirds
 bluejay
 bluejay, steller's
 cardinal
 coot
 cowbird
 dove, mourning
 finch
 finch, gold
 finch, house
 finch, purple
 gull, black-back
 gull, glaucous
 gull, herring
 gull, ringbilled
 meadow lark
 magpie
 mallard duck
 nuthatch
 pigeon
 lark sparrow
 green towhee
 wood duck
 falcon, prairie
 gyrfalcon
 hawks
 hawk, Swainsons
 hawk, marsh
 hawk, redtailed
 hawk, roughlegged
 owl, barn
 owl, great horned
 owl, snowy
 gallinule
 goose, Canada
 junco
 kildeer
 lark, horned

The Administrator may register strychnine for above-ground use in a manner that may result in the taking of a bird protected by the MBTA only pursuant to a permit

issued according to 16 U.S.C. § 703, and 50 C.F.R., Part 21.

C. To remedy violations of the ESA, the Administrator of the EPA and his agents are enjoined from continuing the registrations of strychnine for above-ground use within the range of the following endangered species:

Utah prairie dog
salt marsh harvest mouse
masked bobwhite
Cape Sable sparrow
Puerto Rican plain pigeon
California condor
San Joaquin kitfox
grizzly bear
Morro Bay kangaroo rat
red wolf
dusky seaside sparrow
Mississippi sandhill crane
Attwater's prairie chicken
black-footed ferret
gray wolf

The Administrator of the EPA and his agents are enjoined from continuing the registrations of strychnine within the range of the bald eagle and peregrine falcon until the ongoing formal consultation with the Fish and Wildlife Service is completed and a final notice of determination is issued in response. Thereafter, registrations for use in these ranges is permitted only if no taking by strychnine used under these registrations will occur, and the Administrator explains how this will be prevented.

The Administrator of the EPA and his agents are enjoined from continuing the registration of any strychnine product for above-ground use until the Secretary assesses the resulting likelihood of an incidental taking of any endangered or threatened species, and issues an "incidental take" statement permitting any such take that might occur.

The Administrator shall publish notice of this order and shall notify by letter all registrants of strychnine for above-ground use of the order. The notice and letters shall advise registrants of the injunctions against registrations stated herein, and shall advise all registrants to comply by ceasing the strychnine uses proscribed herein.

8. Plaintiffs are entitled to recover from defendants their reasonable costs and attorney's fees. They shall comply with Local Rule 6 and submit their petition for costs and attorney's fees and a memorandum regarding their entitlement to attorney's fees pursuant to the ESA, 16 U.S.C. § 1540(g)(4); and the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

LET JUDGMENT BE ENTERED ACCORDINGLY.