882 F.2d 1294
 30 ERC 1460, 19 Envtl. L. Rep. 21,440
 DEFENDERS OF WILDLIFE; the Sierra Club; and Friends of
Animals and Their Environment, Appellees,
v.
ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY; and
Secretary, Department of the Interior, Appellants,
and
American Farm Bureau Federation, a nonprofit corporation,
Intervenor-Defendant Below.
DEFENDERS OF WILDLIFE; the Sierra Club; and Friends of
Animals and Their Environment, Appellees,
v.
ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY; and
Secretary, Department of the Interior,
and
American Farm Bureau Federation, a nonprofit corporation, Appellant.
 Nos. 88-5242, 88-5243.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 17, 1988.
Decided Aug. 16, 1989.
 
 Geoffrey Jarpe, St. Paul, Minn., for American Farm Bureau.
 Kathleen Dewey, Washington, D.C., for the Government.
 Brian O'Neill, Minneapolis, Minn., for appellees.
 Before HEANEY,* FAGG, and WOLLMAN, Circuit Judges.
 FAGG, Circuit Judge.
 
 
 1
 Several environmental interest groups sued the Administrator of the Environmental Protection Agency (EPA) and the Secretary of Interior (Secretary) to prohibit the above-ground use of pesticides containing strychnine. American Farm Bureau Federation (Farm Bureau), representing farmers and ranchers who use these pesticides, intervened as a defendant. The district court entered partial summary judgment against the defendants, see Defenders of Wildlife v. Administrator, EPA, 688 F.Supp. 1334, 1355 (D.Minn.1988), and the defendants now appeal. After carefully considering the complex issues raised in this case, we affirm in part and reverse in part.
 
 I. Background
 
 2
 Congress enacted the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) to regulate the use of pesticides in this country. See 7 U.S.C. Secs. 136-136y (1982 & Supp. IV 1986). Under FIFRA, pesticides must be registered with the EPA before they may be sold or distributed. Id. Secs. 136a(a), 136j(a)(1)(A) (1982). The EPA may approve an application for registration only after determining that when used in compliance with "commonly recognized practice," the pesticide will "perform its intended function without unreasonable adverse effects on the environment." Id. Sec. 136a(c)(5)(C)-(D) (1982). If, at any time, the EPA believes a registered pesticide fails to meet this standard, the EPA may initiate an administrative process to cancel the registration. The EPA does so by publishing a Notice of Intent to Cancel. See id. Sec. 136d(b)(1) (1982). Registrants and users of the pesticides may request an administrative hearing and later obtain judicial review of the EPA's final decision on cancellation. See id. Secs. 136d(b), 136n (1982 & Supp. IV 1986).
 
 
 3
 With that statutory background, we turn to the present case. Strychnine is an active ingredient in several pesticides registered with the EPA. This poison is highly toxic and kills both target and nontarget species of wildlife. In midwestern and western states, farmers and ranchers use strychnine to control rodents that may harm their land or crops. These users often place strychnine in grain bait, and the bait attracts the target species. Nontarget species die when they eat either the bait or the poisoned rodent. Thus, environmental groups have become concerned about the threat strychnine poses to protected species of wildlife.
 
 
 4
 In the 1970s, the EPA began to reconsider the above-ground use of strychnine and issued a Rebuttable Presumption Against Registration (RPAR), 40 C.F.R. Sec. 162.11 (1976). See 41 Fed.Reg. 52,810 (1976); see also 40 C.F.R. pt. 154 (1987) (The RPAR process is now called the Special Review process.). While the EPA gathered more information and developed its analysis, the EPA issued several "Position Documents." The documents detailed the risks and benefits of strychnine and stated proposed EPA action. The EPA also consulted the Fish and Wildlife Service (FWS), an agency representing the Secretary, about the impact of strychnine on protected species. See Endangered Species Act (ESA), 16 U.S.C. Sec. 1536(a)(2) (1982) (agency, in consultation with Secretary, must insure its action is not likely to jeopardize protected species).
 
 
 5
 The FWS issued a biological opinion in 1979 that indicated several protected wildlife species were likely to be jeopardized by strychnine use. Id. Sec. 1536(b)(3)(A) (1982). As required by the ESA, the FWS also recommended "reasonable and prudent alternatives" to avoid jeopardy to the extent these alternatives existed. See id.; see also id. Sec. 1536(a)(2). The black-footed ferret was among the animals and birds listed. Because these ferrets often live near prairie dogs, the FWS indicated that strychnine use against prairie dogs should be prohibited if ferrets were present. The FWS later indicated that it could not verify to an acceptable level of probability the absence of ferrets in a prairie dog colony.
 
 
 6
 The EPA continued its study of strychnine and in 1983 issued a Notice of Intent to Cancel under FIFRA. See 48 Fed.Reg. 48,522 (1983). The notice indicated the EPA intended to cancel several strychnine registrations, including registrations for use against meadow mice and prairie dogs. The notice also indicated an intent to cancel the registration for use against ground squirrels unless the registrants implemented further restrictions. Wyoming and South Dakota requested an administrative hearing on cancellation of registrations for meadow mice, prairie dogs, and ground squirrels. See 7 U.S.C. Sec. 136d(b) (1982). These three registrations remained in force during the administrative process. See id. Sec. 136d(c) (1982 & Supp. IV 1986) (a challenged registration remains in effect during pending cancellation proceedings unless EPA suspends registration). The 1983 notice became final regarding other strychnine registrations.
 
 
 7
 Defenders of Wildlife, Sierra Club, Farm Bureau, FWS, and the United States Department of Agriculture intervened in the FIFRA proceeding. After some preliminary stages of the proceeding had occurred but before the hearing had commenced, the parties entered settlement discussions. These discussions lasted from 1984 to 1986. During this period, the EPA reinitiated formal consultation with the FWS regarding the strychnine threat to black-footed ferrets. In November 1984, the FWS issued a second biological opinion. The FWS concluded that jeopardy could be avoided through a precontrol survey for ferrets living near the target prairie dog colony.
 
 
 8
 All parties reached an oral agreement on settlement. The agreement generally permitted the continued above-ground use of strychnine as a pesticide, but restricted the use to a greater extent than under the old registrations. When the agreement was reduced to writing, Defenders of Wildlife and Sierra Club had misgivings and refused to sign the written agreement. These environmental groups notified the administrative law judge of their objections and requested that a hearing take place. All other parties signed the agreement.
 
 
 9
 Although the EPA indicated it would listen to the environmentalists' concerns, the EPA believed it had no obligation to hold an administrative hearing at the urging of these groups. See Environmental Defense Fund, Inc. v. Costle, 631 F.2d 922, 932-37 (D.C.Cir.1980) (if EPA refuses to take action as restrictive as requested by environmentalists, the agency need not provide an administrative hearing to environmentalists; judicial review of EPA's refusal to act is available), cert. denied, 449 U.S. 1112, 101 S.Ct. 923, 66 L.Ed.2d 841 (1981). Thus, an administrative hearing never occurred.
 
 
 10
 In August 1986, when it appeared the EPA intended to go forward with the settlement agreement, Defenders of Wildlife, Sierra Club, and Friends of Animals and Their Environment (collectively Defenders) filed suit in federal district court. Defenders asserted that the EPA and the Secretary had violated several federal wildlife statutes through their actions regarding strychnine: (1) the Endangered Species Act (ESA), 16 U.S.C. Secs. 1531-1543 (1982 & Supp. V 1987); (2) the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. Secs. 668-668d (1982); and (3) the Migratory Bird Treaty Act (MBTA), 16 U.S.C. Secs. 703-712 (1982 & Supp. V 1987).
 
 
 11
 The ESA establishes a private right of action. See 16 U.S.C. Sec. 1540(g)(1) (1982) (citizen suit provision). Defenders relied on this provision as a basis for jurisdiction on the ESA claim. Neither the BGEPA nor the MBTA provides a private right of action. Thus, Defenders relied on a combination of these two environmental statutes, the Administrative Procedure Act (APA), 5 U.S.C. Secs. 551-559, 701-706 (1982 & Supp. IV 1986), and the federal question statute, 28 U.S.C. Sec. 1331 (1982), to form an independent basis of jurisdiction. Finally, Defenders asserted the federal defendants had violated the APA by acting arbitrarily, capriciously, and not in accordance with the law, 5 U.S.C. Sec. 706(2)(A) (1982).
 
 
 12
 Some months after filing suit, Defenders submitted the information they had compiled on poisonings of protected species (the Kill Book) to the EPA. The EPA began to review the Kill Book, but nevertheless published the settlement agreement as its final decision in March 1987. See 52 Fed.Reg. 6762 (1987). In September 1987, over one year after the filing of this suit, the EPA reinitiated consultation with the FWS. The EPA did so based on the Kill Book. The FWS issued two additional biological opinions just after the district court ruled in this case.
 
 
 13
 All parties filed summary judgment motions, and the district court held a hearing on those motions. The court rejected several of the defendants' assertions, including that FIFRA provided the exclusive remedy for Defenders and that Defenders had failed to exhaust their remedies under FIFRA. Defenders of Wildlife v. Administrator, EPA, 688 F.Supp. 1334, 1342-43 (D.Minn.1988). For purposes of its review, the court also found the EPA took final agency action in deciding to restrict but not cancel the three strychnine registrations. Id. at 1343-44.
 
 
 14
 The court reached the merits of Defenders' claim and found the following: (1) the EPA's continued registration of strychnine resulted in poisonings of protected species under the ESA, BGEPA, and MBTA and, thus, constituted an illegal "taking" under those statutes, id. at 1351, 1354; (2) by continuing its registration of strychnine while knowing that strychnine use may result in taking endangered species, the EPA acted not in accordance with the law, id. at 1349; and (3) the EPA's revocation of its 1983 Notice of Intent to Cancel, which was replaced with the settlement agreement, was arbitrary and capricious under the APA, id. at 1348. The district court then entered an order granting injunctive relief. Id. at 1355-57. The order basically enjoined the EPA from continuing its registration of strychnine until the EPA could do so without illegally taking protected species of wildlife. Id. at 1356-57.
 
 II. Analysis
 
 15
 Although they assert other arguments, the defendants focus on one main contention: Defenders are seeking a cancellation of three strychnine registrations, and thus, Defenders must proceed under FIFRA. The defendants contend that Defenders' remedy lies in petitioning the EPA to cancel the three challenged registrations. See, e.g., 40 C.F.R. Sec. 154.10 (1987) (petitioning to initiate Special Review). If the EPA refuses to cancel, Defenders may seek judicial review in the district court under an arbitrary and capricious standard. See 7 U.S.C. Sec. 136n(a) (1982); see also Environmental Defense Fund, Inc. v. Costle, 631 F.2d 922, 935 (D.C.Cir.1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 923, 66 L.Ed.2d 841 (1981).
 
 
 16
 Through FIFRA, Congress implemented a comprehensive framework that balances agricultural and environmental concerns. See, e.g., 7 U.S.C. Sec. 136a(c)(5)(C)-(D) (1982) (pesticide may be registered only if it does not cause "unreasonable adverse effects on the environment"); id. Sec. 136(bb) (1982) (defines "unreasonable adverse effects on the environment" as "unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide"). The EPA, in reviewing registrations and applications for registrations, strikes this balance in each case. FIFRA contains the procedure the EPA must follow in granting, denying, or cancelling registrations, and FIFRA provides for administrative and judicial review of those agency decisions.
 
 
 17
 When Congress has established a special statutory review procedure for administrative actions, we generally treat that procedure as the exclusive means of review. See Sebben v. Brock, 815 F.2d 475, 478 (8th Cir.1987), rev'd on other grounds sub nom. Pittston Coal Group v. Sebben, --- U.S. ----, 109 S.Ct. 414, 102 L.Ed.2d 408 (1988); City of Rochester v. Bond, 603 F.2d 927, 931 (D.C.Cir.1979); cf. Nagel v. Thomas, 666 F.Supp. 1002, 1010 (W.D.Mich.1987) (Because FIFRA has a comprehensive scheme for judicial review, the general federal question statute cannot be relied on as jurisdictional base for a FIFRA challenge.). We believe Congress intended that FIFRA provide the exclusive means of cancelling a registration. If Defenders were suing only to cancel pesticide registrations, we would require them to proceed under the FIFRA framework. See Merrell v. Thomas, 807 F.2d 776, 782 n. 3 (9th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 145, 98 L.Ed.2d 101 (1987) (In a suit to force the EPA to comply with the National Environmental Policy Act before registering pesticides, the Ninth Circuit stated that if Merrell had sued to cancel a pesticide registration, Merrell would have failed to exhaust administrative remedies.).
 
 
 18
 Defenders, however, claim they are suing to enforce various wildlife statutes. According to Defenders, any cancellations that occur will result only as an indirect effect of forcing the EPA to comply with the wildlife statutes. We turn to examine the parties' arguments.
 
 A. The Endangered Species Act
 
 19
 The Supreme Court has characterized the Endangered Species Act (ESA), 16 U.S.C. Secs. 1531-1543 (1982 & Supp. V 1987), as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978). In the ESA, Congress declared that "all [f]ederal * * * agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities [to further] the purposes of this [Act]." 16 U.S.C. Sec. 1531(c)(1) (1982); see id. Sec. 1532(3) (1982) (defining conserve). The ESA thus imposes substantial and continuing obligations on federal agencies. See Sierra Club v. Lyng, 694 F.Supp. 1260, 1270 (E.D.Tex.1988).
 
 
 20
 Even though a federal agency may be acting under a different statute, that agency must still comply with the ESA. See Conservation Law Found. v. Andrus, 623 F.2d 712, 715 (1st Cir.1979) (ESA applied "of its own force" to actions of Secretary taken under Outer Continental Shelf Lands Act). Congress has made "a conscious decision * * * to give endangered species priority over the 'primary missions' of federal agencies." Tennessee Valley Auth., 437 U.S. at 185, 98 S.Ct. at 2297. FIFRA does not exempt the EPA from complying with ESA requirements when the EPA registers pesticides. Indeed, a pesticide registration that runs against the clear mandates of the ESA will most likely cause an unreasonable adverse effect on the environment under FIFRA. See, e.g., 40 C.F.R. Sec. 154.7(a)(3)-(5) (1987); EPA Exhibit 265 at ii (Position Document 4) (acknowledging that "[t]he protection of endangered species is critical to [EPA] decisions"). Finally, through its conduct in dealing with the strychnine question, the EPA has recognized that the ESA applies to actions taken by it under FIFRA.
 
 
 21
 Unlike some statutes, the ESA provides a private right of action to enjoin violations of the Act: "any person may commence a civil suit * * * to enjoin [another], including the United States and any other governmental * * * agency[,] * * * [claimed] to be in violation of any provision of this [Act] or regulation issued under the authority [of this Act] * * *." 16 U.S.C. Sec. 1540(g)(1)(A) (1982). Congress thus encouraged citizens to "bring civil suits * * * to force compliance with any provision of the Act." Tennessee Valley Auth., 437 U.S. at 181, 98 S.Ct. at 2295. We believe the citizen suit provision permits Defenders to sue the EPA in an effort to enjoin any asserted violations of the ESA. See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate."). The district court properly permitted Defenders to proceed under the citizen suit provision. Consequently, we turn to the merits of the ESA claim.
 
 
 22
 The district court held the EPA had violated the ESA because its continued registrations of strychnine resulted in unauthorized takings of endangered species. Defenders do not appeal the court's rejection of their other assertions of ESA violations. Thus, we consider only the takings issue.
 
 
 23
 The ESA commands that a federal agency, in consultation with the Secretary, must "insure that any action [the agency] authorize[s] * * * is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. Sec. 1536(a)(2) (1982). Thus, in fulfilling this obligation to insure against jeopardy, the "acting agency" (here, the EPA) consults with the Secretary who then issues a biological opinion. The opinion indicates the effect of the agency action on protected species. Id. Sec. 1536(b)(3)(A) (1982). The Secretary also identifies any "reasonable and prudent alternatives" that exist to avoid jeopardizing these species. Id. The ultimate burden remains on the acting agency to insure any action it pursues "is not likely to jeopardize" protected species. Id. Sec. 1536(a)(2).
 
 
 24
 The ESA also generally prohibits the "taking" of a protected species. See id. Sec. 1538(a)(1)(B)-(C) (1982). The Act, however, provides an exception for takings that occur incidentally to the agency's actions and are authorized by the Secretary. See id. Sec. 1536(b)(4), (o)(2) (Supp. V 1987); see also 50 C.F.R. Sec. 402.02 (1987) (defining incidental taking). After consultation, the Secretary will issue an incidental taking statement if the Secretary concludes: (1) the agency's action, with any reasonable and prudent alternatives, is not likely to jeopardize the continued existence of protected species under the ESA; and (2) any incidental taking of these species is not likely to jeopardize their existence. 16 U.S.C. Sec. 1536(b)(4); see id. Sec. 1536(a)(2). The incidental taking statement will identify the expected impact of the incidental takings, the reasonable and prudent measures necessary to minimize the impact, and the terms and conditions that the agency must comply with to implement these measures. 16 U.S.C. Sec. 1536(b)(4); 50 C.F.R. Sec. 402.14(g)(7), .14(i) (1987). An agency must have this written authorization before proceeding with action that results in an incidental taking.
 
 
 25
 The EPA failed to obtain an incidental taking statement from the FWS until 1988. The record, however, shows strychnine deaths of endangered species occurred before that time. Thus, the issue here is whether the continued registration of a pesticide, as distinguished from the distribution or use of that pesticide, can constitute an illegal taking under the ESA.
 
 
 26
 Congress afforded endangered species "the highest of priorities." Tennessee Valley Auth., 437 U.S. at 174, 98 S.Ct. at 2292. Thus, the ESA broadly defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. Sec. 1532(19) (1982); see S.Rep. No. 307, 93d Cong., 1st Sess. 7, reprinted in 1973 U.S.Code Cong. & Admin.News 2989, 2995 (" 'Take' is defined * * * in the broadest possible manner to include every conceivable way in which a person [including federal agencies] can 'take' or attempt to 'take' any fish or wildlife."). A taking occurs when the challenged activity has "some prohibited impact on an endangered species." Palila v. Hawaii Dep't of Land & Natural Resources, 639 F.2d 495, 497 (9th Cir.1981) (state's maintenance of sheep and goats in critical habitat of an endangered species, causing destructive impact on that species, constituted a taking by state under the ESA); Sierra Club, 694 F.Supp. at 1268-72 (United States Forest Service tree-cutting practices harmed habitat of an endangered species and thus constituted a taking). The prohibited impact can arise from acts that "significantly impair[ ] essential behaviorial patterns * * * [like] feeding." 50 C.F.R. Sec. 17.3 (1987); see Palila v. Hawaii Dep't of Land & Natural Resources, 852 F.2d 1106, 1108 (9th Cir.1988) (taking includes actions other than direct physical injury).
 
 
 27
 The EPA's strychnine registrations had a prohibited impact on endangered species. See National Wildlife Fed'n v. Hodel, 23 Env't Rep.Cas. (BNA) 1089, 1092-93 (E.D.Cal.1985) (The FWS authorized the use of lead shot ammunition, which resulted in secondary poisoning of bald eagles; the court held the FWS's authorization constituted a taking under the ESA.). First, the record shows endangered species have eaten the strychnine bait, either directly or indirectly, and as a result, they have died. The district court noted that defendants did not seriously dispute these poisonings had occurred. See Defenders of Wildlife, 688 F.Supp. at 1354 n. 36. Second, strychnine can be distributed only if it is registered. Consequently, the EPA's decision to register pesticides containing strychnine or to continue these registrations was critical to the resulting poisonings of endangered species. The relationship between the registration decision and the deaths of endangered species is clear. We thus conclude the EPA's registrations constituted takings of endangered species.
 
 
 28
 Although we believe takings have occurred, we must continue our inquiry. The ESA permits takings under limited circumstances. See 16 U.S.C. Sec. 1536(b)(4), (o)(2). As we noted earlier, see ante at 1300, takings that are incidental to the agency action and authorized by the Secretary will not violate section 1538 (prohibited takings) if the takings comply with the incidental taking statement issued by the Secretary. See 16 U.S.C. Sec. 1536(b)(4), (o)(2); 50 C.F.R. Sec. 402.14(g)(7), .14(i) (1987). In this case, the EPA had no authorization from the Secretary for the incidental takings. The FWS first issued an incidental taking statement to the EPA in 1988, just after the district court rendered its decision. Because the EPA acted without an incidental taking statement, the takings violated the ESA.
 
 
 29
 The EPA now contends the 1988 incidental taking statement excuses the incidental takings that have already occurred. The statement by FWS indicates that the anticipated level of incidental takings will be minimal provided the reasonable and prudent alternatives are followed. Under the ESA, however, an agency must obtain an incidental taking statement before it takes the protected species. The 1988 FWS statement does not retroactively excuse the takings that occurred before the Secretary issued the statement. We thus agree with the district court that the EPA's actions resulted in takings that violated the ESA. See Defenders of Wildlife, 688 F.Supp. at 1354. The court properly enjoined the EPA from continuing strychnine registrations under these circumstances. See id. at 1354, 1357.
 
 
 30
 Nevertheless, our decision does not foreclose the EPA from asking the district court to rescind the ESA injunction in light of the 1988 FWS taking statement. If the EPA can show that it has now obtained authorization for the incidental takings and has acted in compliance with the requirements of the taking statement, the court should lift the ESA injunction.
 
 
 31
 B. The Bald and Golden Eagle Protection Act and the Migratory Bird Treaty Act (the "Bird Acts")
 
 
 32
 Unlike the ESA, neither the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. Secs. 668-668d (1982), nor the Migratory Bird Treaty Act (MBTA), 16 U.S.C. Secs. 703-712 (1982 & Supp. V 1987), contain provisions for private rights of action. Further, Defenders concede that they could not assert a private right of action, express or implied, under the Bird Acts. See Defenders of Wildlife, 688 F.Supp. at 1349. Defenders therefore rely on a combination of the Administrative Procedure Act (APA), the BGEPA, the MBTA, and 28 U.S.C. Sec. 1331 (1982) (federal question jurisdiction) to form an independent source of jurisdiction.
 
 
 33
 The district court found this jurisdictional argument persuasive. The court relied on Alaska Fish & Wildlife Federation & Outdoor Council, Inc. v. Dunkle, 829 F.2d 933 (9th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988), and Defenders of Wildlife v. Andrus, 428 F.Supp. 167 (D.D.C.1977). See Defenders of Wildlife, 688 F.Supp. at 1349-50. Those cases, however, deal with challenges to agency action taken under the particular wildlife statute in question. See Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc., 829 F.2d at 934-36, 938; Defenders of Wildlife, 428 F.Supp. at 168. Thus, they reflect the traditional manner in which the APA has been used. See Glacier Park Found. v. Watt, 663 F.2d 882, 885 (9th Cir.1982) ("Regardless whether a statute implies a private right of action, administrative actions [under the statute] may be challenged under the APA * * *."). Our situation is different. The EPA acted under FIFRA. Yet, Defenders seek review under the Bird Acts by using the APA and section 1331.
 
 
 34
 We are reluctant to permit this type of collateral challenge. If Defenders believe the EPA is acting "not in accordance with law," 5 U.S.C. Sec. 706(2)(A) (1982), by violating the Bird Acts, Defenders could notify the EPA. Specifically, Defenders could petition the EPA to cancel registrations or request other action. If the EPA refused, Defenders could obtain judicial review in the district court as provided by FIFRA. See 7 U.S.C. Sec. 136n(a) (1982). Although the APA's standard of review is available, 5 U.S.C. Sec. 706(2)(A) (e.g., arbitrary, capricious, and not in accordance with law), any administrative and judicial review would be obtained under the FIFRA framework. The APA standard of review would thus operate as a part of FIFRA. See S.Rep. No. 838, 92d Cong., 2d Sess. 28, reprinted in 1972 U.S.Code Cong. & Admin.News 3993, 4019 ("[Under FIFRA,] [j]udicial review in district courts will be in accordance with the law generally applicable to administrative procedure."). Here, relying on the APA and section 1331, Defenders have attempted to challenge the EPA's action under FIFRA through a totally separate suit.
 
 
 35
 We acknowledge that some support exists for permitting this collateral review. See, e.g., Citizens Against Toxic Sprays, Inc. v. Bergland, 428 F.Supp. 908, 938-39 & n. 99 (D.Or.1977) (suggesting citizens group could use APA, section 1331, and BGEPA to challenge actions of Forest Service taken under forest management statutes); cf. Chrysler Corp. v. Brown, 441 U.S. 281, 317-18, 99 S.Ct. 1705, 1725-26, 60 L.Ed.2d 208 (1979) (federal agency acting under executive orders and regulations disclosed information about Chrysler in response to Freedom of Information Act request; Chrysler could challenge this final agency action as "not in accordance with law" under APA because Chrysler claimed disclosure violated Trade Secrets Act); Oregon Envtl. Council v. Kunzman, 714 F.2d 901, 903 (9th Cir.1983) (through APA and FIFRA, citizens group could sue United States Department of Agriculture to challenge the agency's decision to spray area even though FIFRA has no private right of action).
 
 
 36
 Nevertheless, we believe that review under the APA is precluded. Section 704 of the APA provides: "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. Sec. 704 (1982). Because FIFRA provides a framework for obtaining judicial review, the district court had no jurisdiction to consider these claims. "When Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the * * * established special statutory procedures relating to specific agencies." Bowen v. Massachusetts, --- U.S. ----, 108 S.Ct. 2722, 2737, 101 L.Ed.2d 749 (1988). We thus reverse the district court on the BGEPA and MBTA claims.
 
 C. Administrative Procedure Act
 
 37
 Defenders generally claim the EPA's revocation of the 1983 Notice of Intent to Cancel violated the APA. According to Defenders, the EPA's action was arbitrary, capricious, and not in accordance with the law. See 5 U.S.C. Sec. 706(2)(A). The EPA intensively studied strychnine before issuing the 1983 Notice to Cancel. The EPA, however, failed to obtain an additional biological study, other than the 1984 FWS opinion on black-footed ferrets, before settling the cancellation issue. The district court found the EPA's change in position was without adequate consideration and thus arbitrary and capricious. Defenders of Wildlife, 688 F.Supp. at 1347-48.
 
 
 38
 Additionally, until the EPA reinitiated consultation with FWS in 1987, the EPA had failed to obtain incidental taking statements regarding the impact of strychnine registrations. See 16 U.S.C. Sec. 1536(b)(4), (o)(2) (EPA obtained the FWS opinions in 1979 and 1984; Congress amended the ESA in 1982 to provide for incidental taking statements). The district court found the EPA had taken action not in accordance with law when it knew continued registration might result in incidental takings and yet finalized the revised registrations before receiving FWS approval for the takings. Defenders of Wildlife, 688 F.Supp. at 1349.
 
 
 39
 The APA generally provides a framework for judicial review of final agency action when an adequate remedy is otherwise lacking. 5 U.S.C. Sec. 704. It does not provide an independent source of jurisdiction or create a cause of action when none previously existed. See Billops v. Department of the Air Force, 725 F.2d 1160, 1163 (8th Cir.1984). As this court has noted, see ante at 1301-1302, FIFRA contains its own judicial review framework for agency action taken under that statute, see 7 U.S.C. Sec. 136n (1982 & Supp. IV 1986). Although the APA may state the scope of review, 5 U.S.C. Sec. 706, FIFRA still provides the mechanism for obtaining judicial review. Thus, the APA does not operate separately from FIFRA, but instead as a part of FIFRA. See S.Rep. No. 838, 92d Cong., 2d Sess. 28, reprinted in 1972 U.S.Code Cong. & Admin.News 3993, 4019.
 
 
 40
 Defenders' challenge here relates solely to the EPA's action under FIFRA. Because FIFRA provides for judicial review even without an administrative hearing, we must require Defenders to follow that special framework in generally challenging EPA action as "arbitrary, capricious, * * * or * * * not in accordance with law," 5 U.S.C. Sec. 706(2)(A). See Sebben v. Brock, 815 F.2d 475, 478 (8th Cir.1987), rev'd on other grounds sub nom. Pittston Coal Group v. Sebben, --- U.S. ----, 109 S.Ct. 414, 102 L.Ed.2d 408 (1988). The district court had no jurisdiction to consider the APA claim, and thus, we reverse the court's decision regarding this claim.
 
 III. Conclusion
 
 41
 First, Defenders could properly proceed under the citizen suit provision of the ESA to enjoin claimed violations of that Act. Under the circumstances presented, the EPA's strychnine registrations constituted takings under the ESA. The Secretary did not authorize these takings, and thus, they were not excused through the incidental taking provisions of the ESA. We affirm the district court to this extent. On its own initiative, however, the EPA may seek to have the injunction lifted by showing it has now complied with the incidental taking provisions of the ESA.
 
 
 42
 Second, the district court had no jurisdiction to consider Defenders' claims under the BGEPA and MBTA. We thus reverse the court's decision to this extent and vacate that portion of the injunction granting relief on these two claims. Third, the district court was without jurisdiction to consider Defenders' claim that the EPA acted arbitrarily, capriciously, and not in accordancewith law. We reverse the court's decision on this claim.
 
 
 43
 Affirmed in part and reversed in part.
 
 
 
 *
 The HONORABLE GERALD W. HEANEY assumed senior status January 1, 1989