**Randy HARDIN, E.C. Hardin, Jr., Evelyn H. Allmon, Vernon Blasingame, Gary E. Goodwin, Melanie R. Goodwin, Ed Fortson and Marion Fortson Plaintiffs**

v.

**BASF CORPORATION Defendant**

**Forrest Falls, Mary Ann Falls, Hilda Baumgarner, Leroy Baumgarner, Allen Cook, Kerry Falls, Lane Falls, Sandy Falls, Gary Houston, Keith Houston, Rose Houston, Bennie Ladd, Ruth Ladd, Melvin Messer, Ruth Messer, Shelby Newberry, and Artie Winningham Plaintiffs**

v.

**BASF Corporation Defendant**

**No. 4:00 CV 00500 SWW, 4?00 CV 00503 SWW.**

United States District Court,
E.D. Arkansas,
Western Division.

Sept. 26, 2003.

William J. French, Esq., Conant, French & Chaney, L.L.C., Dallas, TX.

A.B. Conant Jr., Esq., Conant, French & Chaney, L.L.C., Dallas, TX.

Joseph Henry Bates III, Esq., McMath, Vehik, Drummond, Harrison & Ledbetter, P.A., Little Rock.

J. Bruce McMath, Esq., McMath, Vehik, Drummond, Harrison & Ledbetter, P.A., Little Rock.

Patrick William McAlpine, Esq., Quattlebaum, Grooms, Tull & Burrow PLLC, Little Rock.

John E. Tull III, Esq., Quattlebaum, Grooms, Tull & Burrow PLLC, Little Rock.

Steven W. Quattlebaum, Esq., Quattlebaum, Grooms, Tull & Burrow PLLC, Little Rock.

### MEMORANDUM AND ORDER

SUSAN WEBBER WRIGHT, Chief Judge.

Plaintiffs, commercial tomato growers in eastern Arkansas, bring this lawsuit pursuant to the Court's diversity jurisdiction, seeking compensatory and punitive damages for crop losses allegedly caused by a herbicide marketed under the trade name Facet, manufactured by Defendant BASF Corporation ("BASF"). This order addresses two motions currently pending in this case: (1) BASF's motion for summary judgment based on federal preemption (docket entry # 111) and (2) Plaintiffs' motion for reconsideration of their motion to amend to add a claim for violations of the Arkansas Deceptive Trade Practices Act (docket entry # 174). After full consider-

ation of these motions, as well each related response and reply and pertinent portions of the record, the Court concludes that Defendant's motion for summary judgment should be granted and Plaintiffs' motion for reconsideration should be denied.

## I. Defendant's Motion for Summary Judgment on the Basis of Federal Preemption

Plaintiffs allege that Facet, which is used by rice farmers to kill barnyard grass, poses a substantial danger to non-target vegetation, particularly tomatoes. They claim that since 1992, Facet applied to rice fields in eastern Arkansas has drifted to their tomato crops and damaged them. According to Plaintiffs, regardless of precautions followed in using Facet, it is a defective and unreasonably dangerous product.

Plaintiffs seek relief under two theories: negligence and strict liability. They claim that BASF negligently designed, manufactured, and supplied Facet and failed to test the herbicide and "take measures to abate or remediate the damage caused by drift or movement of Facet onto off-target locations, including Plaintiffs' property." Docket entry # 149, ¶ 119. Additionally, they charge that BASF supplied Facet in a defective condition-specifically, with the alleged capacity to harm non-target plants-rendering the herbicide unreasonably dangerous. BASF moves for summary judgment, asserting that Plaintiffs' claims are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").

### A. Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When considering a motion for summary judgment, a court must construe all evidence in favor of the non-moving party. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). However, the non-moving party may not rest on mere allegations or denials of his pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348.

### B. FIFRA

In 1972, Congress amended FIFRA, transforming what had been a labeling law into a comprehensive regulatory statute governing the use, sale, and labeling of pesticides [1] produced and sold in intrastate and interstate commerce. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 991–95, 104 S.Ct. 2862, 2867–2862, 81 L.Ed.2d 815 (1984) (providing a detailed history of FIFRA). As amended, FIFRA gives the Environmental Protection Agency ("EPA") authority over the registration, cancellation, and suspension of pesticides. No person in any state may distribute or sell a pesticide that is not registered with the EPA in accordance with FIFRA. *See* 7 U.S.C. § 136a.

FIFRA establishes an complex review process for approval of a label under which

---

**1.** FIFRA's definition of "pesticide" includes herbicides. *See* 7 U.S.C. § 136(u).

a pesticide may be marketed. Pesticide manufacturers must submit draft labels addressing several topics including ingredients, directions for use, and adverse affects. As a prerequisite to registration, the EPA must determine, among other things, that a pesticide will perform its intended function without causing unreasonable adverse effects on the environment. *See* 7 U.S.C. § 136a(c)(5)(A)-(D). FIFRA defines "environment" as "water, air, land, and all plants and man and other animals living therein and the interrelationships which exist amount these." 7 U.S.C. § 136(j).

To ensure uniform labeling requirements for pesticides, FIFRA expressly prohibits states from imposing "any requirements for labeling or packaging in addition to *or* different from those required under [FIFRA]." 7 U.S.C. § 136v(b)(emphasis added).[2] The Eighth Circuit has interpreted this express preemption provision to usurp any state law claims, whether predicated on statutory or common law, premised on inadequate labeling or failure to warn. *See Nat'l Bank of Commerce of El Dorado, Arkansas v. Dow Chemical Co.*, 165 F.3d 602, 608 (8th Cir.1999).

Under the law of this Circuit, whether a plaintiff's claim is preempted under § 136v(b) does not depend on the label a plaintiff attaches to his claim: "It is immaterial whether an inadequate labeling or failure to warn claim is brought under a negligence or products liability theory. If a state law claim is *premised* on inade-

quate labeling or a failure to warn, the impact of allowing the claim would be to impose an additional or different requirement for the label or packaging." *Id.* at 608 (emphasis in original).

The line between claims attacking a pesticide's label and those seeking relief for a defective product is not always clear. Recognizing this fact, in *Netland v. Hess & Clark*, 284 F.3d 895 (8th Cir.2002), the Eighth Circuit adopted a test for determining whether a state law claim actually imposes a labeling requirement preempted under FIFRA. *Id.* at 100. That test inquires "whether one could reasonably foresee that the manufacturer, in seeking to avoid liability for the error, would choose to alter the product or the label." *Worm v. American Cyanamid Co.*, 5 F.3d 744, 747–48 (4th Cir.1993).

### C. Analysis of Plaintiffs' Claims

Plaintiffs argue that BASF would not alter Facet's label to avoid liability because Facet is so toxic that no label warnings or application instructions could make the herbicide safe for the environment, namely non-target plants. However, as explained below, the record shows otherwise.

In 1992, when Facet appeared on the market, Plaintiffs began suffering significant crop losses, which they reported to the Arkansas State Plant Board ("ASPB"). *See* docket entry # 154, Jan. 21, 2001 Hr'g Tr. at 27.[3] ASPB investigators, local cooperative extension service personnel, and University of Arkansas ("U of A") profes-

---

2. Although states are precluded from imposing requirements for pesticide labeling, FIFRA expressly authorizes states to restrict the use of pesticides. See 7 U.S.C. § 136v(a)("A State may regulate the sale or use of any federally registered pesticide ... but only if and to the extent the regulation does not permit any sale or use prohibited by this chapter."). Consequently, a state could pro-

hibit the sale and use of a pesticide within its borders.

3. On January 21, 2003, the Court held a hearing concerning several pending motions, including BASF's motion for summary judgment on the basis of federal preemption. District Judge Stephen M. Reasoner presided over the hearing. This case was originally

sors examined Plaintiffs' fields, and, after a few years, reached a consensus that quinclorac, the active ingredient in Facet, was damaging Plaintiffs' tomatoes. *Id.* at 29.

In 1999, the ASPB, EPA, and BASF funded a study carried out by U of A professors, named the "Bansal study" after U of A Professor R.K. Bansal, to learn more about Facet's effect on non-target crops. As part of the study, researchers took air, plant, and soil samples on a regular basis during the 1999 tomato growing season at five, on-farm experimental sites in northeast Arkansas. *See* docket entry # 143, Ex. 86 ("A Study of Facet (Quinclorac) Drift and its Impact") at 3. The conclusion segment of the Bansal study report reads, in part, as follows:

> Tomato plants at all five experimental sites in this study were found to have varying degrees of abnormal growth symptoms from the second or third week of May onward. Earliest appearance of symptoms was on May 12. By May 18 all sites had abnormal growth symptoms. The most common symptoms were severe curling and cupping of leaves, small leaf size, lack of vigor, bloom shedding, and poor setting/growth of fruit. At some sites, fruit set on the first set of clusters were quite good. However, fruit set on secondary clusters was extremely poor due to excessive bloom shedding. The observed foliar symptoms were consistent with those known to be caused by quinclorac.... Results from the analysis of air samples showed that the ambient air over the tomato fields contained detectible amounts of quinclorac on many days during the season.... *With our limited data on Facet applications, it was not possible to determine the specific sources of quinclorac found in the ambient air.* It was observed that on many days quinclorac was detected in the air samples when there was no reported Facet application within five miles of the experimental site.

*Id.* at 42–44 (emphasis added). To summarize, the Bansal study reported damage to tomato plants, apparently caused by quinclorac, in fields where researchers detected trace amounts of quinclorac in the air. However, study participants could not determine the source of the quinclorac.

Plaintiffs have designated two expert witnesses: Philip A. Banks, Ph.D. and John Brown, Ph.D. Dr. Banks, a weed scientist, issued a report regarding Plaintiffs' crop losses and the use of Facet. *See* docket entry # 141, Ex. 1. Dr. Banks' report concludes as follows:

> Accordingly, based both on the circumstantial evidence and the direct physical evidence of the Bansal study ... it is my opinion that the source of the year to year occurrence of Facet symptoms in the crops at issue is clearly related to the widespread application of the herbicide Facet in the affected areas and the resulting localized drift that inevitably occurred. It is further my opinion that *the product is inherently defective as an aerially applied rice herbicide because it cannot be applied in a region of concentrated rice production* ... without substantial risk of causing collateral damage to sensitive crops in the region via localized drift.

*Id.* at 6 (emphasis added).

Dr. Banks' report states: "No matter how effective any pesticide may be in terms of the target organism, if it cannot be applied with reasonable safety, in terms

assigned to Judge Reasoner, who recused from the case on May 13, 2003. The case was then reassigned to District Judge G. Thomas Eisele, who also recused. On May 20, 2003, the case was reassigned to the docket of Chief District Judge Susan Webber Wright (docket entry # 165).

of off-target organisms, it is useless as a commercial pesticide. A pesticide that cannot be safely applied using reasonable application techniques is therefore by definition unreasonably dangerous and defective."

Although Dr. Banks' written report states that Facet is useless, unreasonably dangerous, and defective, his deposition testimony demonstrates that he cannot say, with any reasonable degree of scientific certainty, that Facet is dangerous to non-target plants no matter how or where it is applied.[4] When asked whether there is any application instruction or restriction that would allow the useful application of Facet, Dr. Banks answered: "I don't know. It's possible, but I don't know right now what that would be." Docket entry # 111, Ex. 5, Banks Dep. at 157. When asked whether he could state, with a reasonable degree of scientific certainty, that Facet would be unreasonably dangerous if limited to ground, as opposed to aerial, application, Dr. Banks stated: "No." *Id.* at 168.[5] Dr. Banks also conceded that there may be circumstances unique to the rice growing region of eastern Arkansas that contribute to damage to nearby tomato crops. *See id.* at 169, 297.[6] Finally, Dr. Banks stated that the amount of Facet used in a given area is "probably the most important factor" that contributes to Facet localized drift. *Id.* at 297.

Dr. Brown testified during his deposition that he would defer to Dr. Banks as to whether Facet can be safely applied in a given geographic area (*see* docket entry # 111, Ex.7, at 191–92). He also acknowledged that he could not say whether restricting the use of Facet to ground application would eliminate localized drift of Facet, and he admitted that restricting the amount of Facet used in a given area might avoid injury to near-by tomato plants.

■ The record simply does not support Plaintiffs' claim that label instructions or warnings would do nothing to remedy Facet's alleged toxic affect on non-target plants. Instead, it is clear that Plaintiffs' negligence and strict liability claims boil down to a charge that Facet cannot be applied aerially to the rice growing areas of eastern Arkansas,[7] in accordance with Facet's label directions, without causing damage to certain non-target crops, including tomatoes.[8]

4. Additionally, he acknowledged that Facet is extremely useful in controlling barnyard grass that has become resistant to other herbicides. *See* Docket entry # 111, Ex. 5, at 159.

5. Dr. Banks testified: "Now, it's possible that, you know, by doing some soil-applied applications with ground rigs prior to planting the rice, it might go an early enough— and, to be honest with you, I'm no for sure how feasible that might be to pull off, but, I mean, that might be feasible." *Id.* at 162.

6. Dr. Banks stated that "in the area of Arkansas where the Bansal study was conducted, where the tomatoes are grown and the rice is grown, and Facet is applied" Facet is unreasonably dangerous. *See id.* at 169. He stated: "it's possible that other circumstances may exist in other parts in a rice-growing region that I am not aware of . . . that might not make it as dangerous of a product." *Id.*

7. Plaintiffs provide no evidence that tomato growers in other areas of the United States have suffered problems from Facet. However, they state that before BASF marketed Facet in the United States, it took the herbicide off the shelves in Japan because it killed non-target plants. However, as Plaintiffs acknowledged during the January 21, 2003 hearing, the methods used to grow rice in Japan are much different than those used in Arkansas, and herbicides are transported to plants through water, not air. *See* docket entry # 154, Jan. 21, 2003 Hr'g Tr. at 35.

8. When the basis of a claim is that a pesticide is defective when used in a particular way or in a particular area, the claim is essentially an attack on the failure to warn against a particular use of the pesticide, which is preempted under FIFRA. *See Dow Agrosciences LLC v. Bates*, 332 F.3d 323, 332 (holding that FIFRA

■ Even viewing Plaintiffs' claims as asserting that no label warnings or precautions could prevent damage to non-target vegetation, Plaintiffs challenge the content of Facet's label. EPA regulations require that pesticide labels include any limitations or restrictions on use required to prevent unreasonable adverse effects on the environment. *See* 40 C.F.R. § 156.10(i)(x). In accordance with this requirement, Facet's EPA-approved label specifically addresses the problem of drift and injury to non-target plants and advises applicators of precautions that must be taken to avoid injury to non-target plants. *See* docket entry # 111, Ex. 1.

For instance, under the heading "Aerial Application–Special Directions/Restrictions *Susceptible Adjacent Crops*" the label states: "The applicator must evaluate the application situation to determine how much distance is necessary to prevent spray drift onto any emerged crops, especially sensitive crops. When applying, do not allow Facet 75 DF to contact emerged sensitive crops listed in Restrictions and Limitations or emerged cotton or soybeans. Severe injury may result if this occurs." *Id.* at 4.

The "Restrictions and Limitations" portion of the label reiterates that Facet should not be permitted to drift to "other desirable plants-especially sensitive crops belonging to the following plant families: 1. Solanaceae [tomato, potato, tobacco, eggplant, peppers] ...." *Id.* Additionally, this section reads: "Do not allow spray containing Facet 75 DF to drift onto areas where tomatoes are to be planted, have been planted, or onto emerged tomatoes that were transplanted as severe injury will occur." *Id.* The label contains additional application procedures that must be followed to avoid drift hazards, including wind and temperature conditions required for application and use of drift control agents and drift reduction nozzles. *Id.* Finally, the label contains special instructions for aerial application in Arkansas, stating: "For aerial application in Arkansas, please contact the Arkansas State Plant Board or representative for specific instructions about applying Facet 75 DF in Arkansas." *Id.*

The Court concludes that it is reasonable to foresee that BASF would alter its label to avoid liability for drift and damage to non-target plants by adding restrictions and limitations regarding aerial application in Arkansas.[9] Accordingly, the Court concludes that Plaintiffs' product liability claims seek to impose labeling requirements for Facet "in addition to and different from" those required under FIFRA.

■ Plaintiffs assert that FIFRA preemption should not apply in this case because the EPA registered Facet on a conditional basis. FIFRA permits the EPA

preempted claim that pesticide is dangerous when applied to crops in soil with high pH levels); *Grenier v. Vermont Log Buildings, Inc.*, 96 F.3d 559, 564 (1st Cir.1996) (finding the plaintiff's defective design claim preempted because it was no more than an attack on the failure to warn against a particular use).

9. Possible changes include restricting Facet's use to ground applications and prohibiting the use of Facet in Arkansas. In a 1992 BASF internal memo, BASF's Facet Marketing Manager, Ted Piatt, considered the consequences of restricting the use of Facet to ground application in an effort to reduce complaints of "Facet drift." *See* docket entry # 132, Ex. 34. At that time, BASF decided against ground only application. However, BASF's 1992 decision against restricting Facet to ground application does not support a conclusion that it would never do so. As Plaintiffs' counsel has noted, over the years, in response to complaints from Arkansas farmers, BASF has altered its label and restricted the use of Facet in ways that it "deemed to be ridiculous in '92." Docket entry # 154, at 86.

to conditionally register a pesticide when the agency lacks sufficient data to make an unconditional registration decision. Conditional registration is permitted for pesticides that are substantially similar to a registered pesticide ("me too" registration) and pesticides with new, active ingredients. *See* 7 U.S.C. § 136a(c)(7).

FIFRA contains no provision indicating that its express preemption provision has no application when a pesticide is conditionally approved. As with unconditional registrations, before the EPA may grant a conditional registration, it must determine that the pesticide under consideration will not cause any unreasonable adverse effect on the environment. *See id.* FIFRA's labeling requirements make no distinction between unconditional and conditional registration, and the EPA can exercise similar controls over conditionally and unconditionally approved pesticides. For instance, if the agency determines it needs additional data to support the continued registration of a pesticide, it may require submission of information regardless of whether registration is conditional or unconditional. *See* 7 U.S.C. § 136a(c)(2)(B). Additionally, the EPA can revoke conditional or unconditional registrations when the registrant fails to fulfill a condition of registration. *See* 7 U.S.C. § 136a(c)(2)(B).

In *Nat'l Bank of Commerce of El Dorado, Arkansas v. Dow Chemical Co.,* the Eighth Circuit stated: "Once a label is approved, FIFRA expressly provides for a defense, arising from preemption, against certain state law claims." *Id.* at 608. Here, it is undisputed that the EPA approved BASF's Facet label, and Plaintiffs cite no authority for the proposition that a preemption defense is unavailable in cases of conditional registration.

Finally, Plaintiffs contend that preemption does not apply in this case because (1) the EPA had no authority to grant conditional registration for Facet and (2) the EPA registered Facet only because of political pressure. This Court has no jurisdiction to second guess the EPA's decision to grant BASF's application for registration of Facet. *See Defenders of Wildlife v. Administrator, E.P.A.,* 882 F.2d 1294, 1302 (8th Cir.1989).[10] If Plaintiffs believe that the EPA erred in registering Facet, they may petition the EPA to cancel the registration. If Plaintiffs are unsuccessful, they may obtain judicial review of the EPA's final decision denying their request. *See* 7 U.S.C. § 136n(a).

**10.** Plaintiffs cite *Defenders of Wildlife v. Administrator, E.P.A.,* 882 F.2d 1294, 1299 (8th Cir.1989), for the proposal that they may challenge the EPA's decision to register Facet. Although Plaintiffs may obtain judicial review of the EPA's continued registration of Facet, in accordance with the holding in *Defenders,* they must do so by utilizing FIFRA's administrative review framework.

In *Defenders,* wildlife and environmental organizations sued the EPA, seeking to enjoin the agency from continuing its registration of pesticides containing strychnine, which were threatening protected species of wildlife. The plaintiffs brought suit pursuant to the Endangered Species Act ("ESA"), the Bald and Gold Eagle Protection Act ("BGEPA"), and the Migratory Bird Treaty Act ("MBTA"). The dis-trict court ordered the EPA to cease registration of strychnine, and the EPA appealed, arguing that FIFRA provided the exclusive remedy for the plaintiffs, who had failed to exhaust their remedies under FIFRA. The Eighth Circuit held that because the ESA provides a private right of action to enjoin violations of the Act, the plaintiffs could properly seek injunctive relief under the citizen suit provision of the ESA. However, the Court held that the district court lacked jurisdiction to consider the plaintiffs' claims under the BGEPA and the MBRA, which contain no private right of action provision. The Court stated: "Because FIFRA provides a framework for obtaining judicial review, the district court had no jurisdiction to entertain these claims." *Id.* at 1302.

## II. Plaintiffs' Motion for Reconsideration

On July 6, 2001, Plaintiffs filed a motion to amend their complaint to add additional claims, including a claim pursuant to the Arkansas Deceptive Trade Practices Act ("ADTPA"). In support of their proposed ADTPA claim, Plaintiffs alleged that BASF failed to disclose material information to the EPA in applying for registration of Facet. On March 26, 2002, the Court denied Plaintiffs' motion, finding that FIFRA impliedly preempts any claim that BASF violated the EPA's pesticide registration reporting requirements. *See* docket entry # 60.

FIFRA specifically prohibits the knowing falsification of any application for the registration of a pesticide and gives the EPA substantial enforcement powers, including the ability to impose substantial civil and criminal penalties. See 7 U.S.C. § 136j(a)(2)(M), 1361(a), Accordingly, the principles of implied conflict preemption bar Plaintiffs from pursuing a claim that BASF withheld information from the EPA. *See Nathan Kimmel, Inc. v. DowElanco,* 275 F.3d 1199 (holding that a state law claim premised on allegations that a pesticide manufacturer submitted false information to the EPA was impliedly preempted under FIFRA).

Now before the Court is Plaintiffs' motion to reconsider the decision to deny their motion to amend. In support of their motion for reconsideration, Plaintiffs state that in addition to BASF's alleged misrepresentations to the EPA, their proposed ADTPA claims are based on BASF's statements to Plaintiffs, applicators who applied Facet to rice fields, and ASPB personnel. Plaintiffs allege the following in support of their proposed ADTPA claim:

- BASF personnel told Plaintiffs that their crop damage was caused by other pesticides or misapplication of Facet.

- BASF never told Plaintiffs that the extreme toxicity of Facet doomed their crops.

- BASF sent technical bulletins to farmers and aerial applicators in Arkansas which failed to "disclose the critical information about its defective nature."

- "BASF aggressively marketed Facet in areas where it severely injured the plaintiffs' crops because the publicity from the plaintiffs' crop damage provided a springboard for floating BASF's sales message."

- BASF withheld material information about the defective nature of Facet from the ASPB.

Several Circuit Courts of Appeals have held that state law claims based on a pesticide manufacturer's "off-label" statements about a pesticide that merely reiterate information or restrictions found on the pesticide's label are preempted. *See Andrus v. AgrEvo USA Co.,* 178 F.3d 395, 400 (5th Cir.1999); *Kuiper v. American Cyanamid Co.,* 131 F.3d 656, 662–63 (7th Cir.1997); *Taylor Industries v. Pure–Gro,* 54 F.3d 555, 561 (9th Cir.1995); *Lowe v. Sporicidin Intern.,* 47 F.3d 124, 129 (4th Cir. 1995). Further, the Eleventh Circuit has stated: "If a pesticide manufacturer places EPA-approved warnings on the label and packaging of its product, its duty to warn is satisfied, and the adequate warning issue ends..... Because claims challenging the adequacy of warnings on materials other than the label or package of a product necessarily imply that the labeling and packaging failed to warn the user, we conclude that these claims are also pre-empted by FIFRA." *Papas v. Upjohn Co.,* 985 F.2d 516, 519 (11th Cir.1993); *see also Akee v. Dow Chemical Co.,* 2003 WL 21738603, at *9 (D.Hawai'i, July 21, 2003) (claim that pesticide manufacturer had a duty to warn general public of hazards

associated with its products preempted under FIFRA).

The Court has carefully considered Plaintiffs' motion to reconsider and concludes that it must be denied. *See Knapp v. Hanson,* 183 F.3d 786, 790 (8th Cir. 1999) (although leave to amend should be freely granted when justice so requires, permission to file an amended complaint may be denied when the proposed amendment would be futile). First, BASF's alleged statements to Plaintiffs, that their crop damage was caused by other pesticides or misapplication of Facet, is consistent with Facet's label. Both the label and BASF's alleged statements convey that Facet, used according to the label directions, will not result in damage to non-target crops. Accordingly, these allegations necessarily challenge Facet's label. Second, Plaintiffs' allegations that BASF withheld information about Facet's alleged toxicity amount to a failure-to-warn claims, expressly preempted under FIFRA. Finally, Plaintiffs' claim that BASF aggressively marketed Facet provides no support for a claim pursuant to the ADTPA.

### III. Conclusion

IT IS THEREFORE ORDERED that Defendant's motion for summary judgment on the basis of federal preemption (docket entry # 111) is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' motion for reconsideration (docket entry # 174) is hereby DENIED.

There being no issues for trial, in accordance with the judgment entered together with this order, this case is hereby DISMISSED WITH PREJUDICE.